730 A.2d 877 (1999)
Melvin BERNER, Plaintiff-Appellant, and
Nathan Murray, Plaintiff,
v.
The ENCLAVE CONDOMINIUM ASSOCIATION, INC., Samuel Davis, and Howard Ozeroff, Defendants/Third-Party Plaintiffs-Respondents, and
Frank Checchia, Julie Essey, and Nick Gomez, Defendants/Third-Party Plaintiffs,
v.
Grace Knupp Realty, Inc., and Joan Conover, Third-Party Defendants.
Superior Court of New Jersey, Appellate Division.
Argued May 26, 1999.
Decided June 14, 1999.
*878 Arlene Gilbert Groch, Somers Point, for plaintiff-appellant (Ms. Groch, attorney).
James G. O'Donohue, Princeton, for defendants/third-party plaintiffs-respondents (Pepper Hamilton, Cherry Hill, for defendants/third-party plaintiffs-respondents the Enclave Condominium Association, and Howard Ozeroff, and Hill Wallack, Princeton, for respondent Samuel Davis; Patricia A. Smith, Cherry Hill and Mr. O'Donohue, on the joint brief).
Before Judges BAIME, CONLEY and A.A. RODRIGUEZ.
The opinion of the court was delivered by CONLEY, J.A.D.
Plaintiff, Melvin Berner, a Caucasian condominium owner, alleges in this Law Against Discrimination litigation that he was not permitted to lease his unit to plaintiff Nathan Murray, an African-American, by defendant Enclave Condominium Association (Enclave). The thrust of their ensuing lawsuit is that Enclave rejected Murray as a tenant because of his race. Enclave settled with Murray and obtained summary judgment as to Berner (hereinafter referred to as plaintiff) on the grounds of his lack of standing, as he is Caucasian and not the individual discriminated against. We reverse.
Plaintiff was an owner of a unit in a condominium building which Enclave administers and manages. It is conceded that the leasing of the unit must be approved by Enclave. In November 1995, plaintiff executed a lease of his unit to Murray. It seems fairly clear that Enclave would not approve Murray as a tenant. The reasons therefor are disputed. In support of its motion for summary judgment, Enclave stated as a material fact, which plaintiff admitted, see R. 4:46-2(a),(b), that Enclave had expressed a concern that the prospective tenant's "monthly income was not sufficient to pay the rental amount." On the other hand, in their joint arbitration memorandum, incorporated by reference in the reply to the statement of material facts, plaintiffs asserted the following:
On December 15, 1995 Mr. Murray arrived at The Enclave. He had with him an executed lease, registration statement, occupancy permit receipt, telephone deposit receipt and Grace Knupp Realty receipts for the first month's rent and security deposit. Mr. Murray was greeted by Ernest Jackson a security guard working at The Enclave. Mr. Murray displayed his lease to Mr. Jackson as an explanation of his need to gain access to the building. Mr. Murray was referred to the Condominium Manager, John Loucks. Mr. Murray told Mr. Loucks that he was there to pick up the key to unit 1107 for the purposes of taking occupancy. He handed Mr. Loucks his lease, registration statement and occupancy permit receipt, his receipt for the first month's rent and security deposit. Mr. Loucks took all of these documents into a back room. Mr. Loucks returned shortly and returned the originals to Mr. Murray. *879 Mr. Loucks then made several phone calls. He called Grace Knupp Realty and Melvin Berner. He also had a conference call between Grace Knupp Realty and Melvin Berner to confirm Mr. Murray's tenancy. Finally, he called Samuel Davis, President of the condominium association and the sole member of the condominium's rental committee. Mr. Davis was advised that a tenant who had not yet been interviewed was there to take occupancy of unit 1107. Mr. Loucks asked Mr. Davis if he should allow Mr. Murray to move in that day. Mr. Davis told Mr. Loucks "let him upstairs, I'll talk to him tomorrow." (John Loucks Deposition, p. 90). Mr. Davis then asked Mr. Loucks what Mr. Murray was like. Mr. Loucks told Mr. Davis that "He's a young black gentleman. He has everything he needs." (John Loucks Deposition, p. 90). Mr. Davis then told Mr. Loucks "let him [Mr. Murray] come back tomorrow morning and I'll meet with him and straighten it out then." (John Loucks Deposition, p. 90). Mr. Loucks gave Mr. Murray with [sic] the rules and regulations of The Enclave Condominium. Mr. Murray signed a receipt acknowledging having read and received The Enclave's rules. Mr. Loucks retained the signature page of the rules and regulations for Mr. Murray's tenant file.
Mr. Murray left The Enclave Condominium and rented a room at the Econo Lodge for the night of December 15, 1995. The next morning Mr. Murray went to The Enclave along with his friend Darrell Kelly. Upon their arrival Mr. Murray was met by Rob Raynore the Assistant Condominium Manager. According to Mr. Raynore, Mr. Murray had supplied all of the necessary paperwork and that "he was okay to move-in." (Robert Raynore deposition, p. 88). Mr. Murray was told that Mr. Davis was expecting him. Mr. Murray then waited for Mr. Davis in the lobby from approximately 9:00 a.m. to 2:15 p.m. During those hours he asked several times when Mr. Davis would be available to conduct the interview. Each time Mr. Murray was advised that he was in a meeting and would be available to meet with him "shortly". The Condominium meeting did not start until 10 a.m. which was after Mr. Murray had arrived and was waiting. (Julie Essey Deposition). Mr. Murray and Mr. Kelly continued to wait in the lobby for Mr. Davis. At approximately 1:00 p.m. Mr. Raynore delivered a message to Mr. Davis that Mr. Murray had been waiting since 9:00 a.m. At 2:15 p.m., three board members, Defendants Mr. Davis, Mr. Nick Gomez (deceased and complaint dismissed), and Mr. Howard Ozeroff arrived in the lobby together. Mr. Raynore gave the Murray tenant file to the Defendant board members, who then interviewed Mr. Murray.
... The interview lasted approximately 20 minutes. During the interview Mr. Murray was interrogated about his occupation and his finances, although the financial ability to pay the monthly rent was only relevant to the unit owner, not the Board. (Deposition of Howard Ozeroff). Nevertheless, Mr. Murray explained that he had just started a new job at the Trump Taj Mahal Casino, assured the Board members that he could afford the rent and informed them he had already placed the utilities in his name. He displayed his lease and receipts to the three men, who passed the documents amongst themselves. He then displayed his bank statement, which showed he had over $40,000 in liquid assets. He then assured the defendant board members that he had more than enough finances to keep the rent current for the year and even had the ability to pay the entire year's rent in advance. Defendant board members asked how Mr. Murray had received these funds and he explained that it was the result of a lawsuit from an accident when he was very young. Also, during the interrogation the three men told Mr. *880 Murray that he could not walk in bare feet in the building, he would have to pay an additional amount for a access chip and that he would not be allowed to have more than one guest at a time in his unit.
The three men examined Mr. Murray's lease and all other documents in his file and those that he had provided and they told him that he would be happier living elsewhere and that it would be financially better for him to obtain housing which was less expensive in another building.
At the conclusion of the interrogation, the defendants told Mr. Murray that he would be contacted by a member of the Condominium Association in the next couple of days at which time they would let him know whether or not he had been accepted as a tenant. At no time during the interview did Mr. Davis, Mr. Ozeroff or Mr. Gomez ask Mr. Murray for a phone number or address to contact him.
The tenant was never thereafter contacted by Enclave and never given a key to the unit. The clear implication of this, of course, is the type of invidious discrimination the Law Against Discrimination, N.J.S.A. 10:5-1 to -49, was designed to eradicate. N.J.S.A. 10:5-3; N.J.S.A. 10:5-12h. See generally Fuchilla v. Layman, 109 N.J. 319, 334, 537 A.2d 652, cert. denied, 488 U.S. 826, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988).[1]
In granting Enclave summary judgment as to plaintiff, the motion judge, focusing upon N.J.S.A. 10:5-3 and our decision in Catalane v. Gilian Instrument Corp., 271 N.J.Super. 476, 638 A.2d 1341 (App.Div.), certif. denied, 136 N.J. 298, 642 A.2d 1006 (1994), said in part:
I'm satisfied that the reading of 10:5-3 is consistent with the interpretation by Catalane. The plain reading of the statute says, "The Legislature declares its opposition to such practices of discrimination when directed against any person." That's what it talks about. It talks about the discrimination being directed against any person.
And that's the language that Catalane cited. They cited that verbatim. Cause of action for any person and they got that right from 10:5-3, the second paragraph. Then that paragraph goes on to give the reasons for the discrimination and among those reasons are because of a person's spouse, business associates, et cetera. I don't believe that it says that those list of persons in the second half of that paragraph have standing to file a suit unless they themselves are the direct object of discrimination. I believe that's what is necessary.
[Emphasis added.]
Viewing plaintiff an unaffected third-party, the motion judge concluded he lacked standing to pursue the LAD complaint.
We disagree. Plaintiff was directly affected by Enclave's actions, having lost his lease to Murray.[2] He was no more or less the object of Enclave's conduct than was Murray. We need not, therefore, grapple with the more complex issue of incidental third-party standing in the context of civil rights lawsuits. Compare for example, Hotel St. George Associates v. Morgenstern, 819 F.Supp. 310 (S.D.N.Y. 1993), with Puglisi v. Underhill Park Taxpayer Ass'n, 947 F.Supp. 673 (S.D.N.Y. 1996), aff'd, 125 F.3d 844 (2d Cir.1997).
Moreover, to the extent our statement in Catalane that LAD "did not intend to establish a cause of action for any person other than the individual against whom the discrimination was directed," 271 N.J.Super. at 500, 638 A.2d 1341, might be construed as requiring that a LAD plaintiff need be a member of a protected group, such construction is unwarranted. *881 That was not the issue before us in Catalane. We there were focused upon a discriminated spouse's right to recover per quod damages under the Act. Simply stated, N.J.S.A. 10:5-3 in its "careful recitation of the damages ... intended to [be] allow[ed]," id. at 500, 638 A.2d 1341, does not include per quod damages. And see Hurley v. Atlantic City Police Dept., 174 F.3d 95, 130 (3rd Cir.1999). But more importantly, and consistent with our liberal standing rules, we have not so narrowly viewed the scope of those individuals who might have standing to assert a LAD cause of action. See Craig v. Suburban Cablevision, Inc., 140 N.J. 623, 629-31, 660 A.2d 505 (1995); O'Lone v. New Jersey Dep't of Corrections, 313 N.J.Super. 249, 255, 712 A.2d 1177 (App.Div. 1998); Dunn v. State, Dep't of Human Servs., 312 N.J.Super. 321, 711 A.2d 944 (App.Div.1998); Kessler Inst. for Rehabilitation, Inc. v. Mayor and Council of Borough of Essex Fells, 876 F.Supp. 641 (D.N.J.1995).
As we said in O'Lone, where the object of the alleged discrimination was plaintiff Caucasian's African-American girlfriend, "[r]egardless of the race of this plaintiff, he suffered the same injury as a minority when he was discharged for allegedly associating with a member of a protected group .... that is the functional equivalent of being a member of the protected group." O'Lone, supra, 313 N.J.Super. at 255, 712 A.2d 1177. In this respect, N.J.S.A. 10:5-13 provides that "[a]ny person claiming to be aggrieved by ... unlawful discrimination" may file a LAD complaint. Plaintiff is such an aggrieved person. Cf. Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972).
In addition to his LAD cause of action, plaintiff, in an amended complaint, asserted a federal Fair Housing Act claim. The amendment was filed beyond the applicable two-year federal statute of limitations and, for that reason, was dismissed by the motion judge. Plaintiff argues before us that the amendment should have related back to the timely filed original complaint pursuant to R. 4:9-3. In a supplemental statement of reasons filed pursuant to R. 2:5-6(c), the motion judge has stated that the parties did not raise that issue before him, that he did not consider it, and that he would reconsider his determination if asked to do so. In light of this, since we are reversing the LAD dismissal, we also reverse and remand for reconsideration the dismissal of the federal Fair Housing claim.
Reversed and remanded for further consideration consistent with this opinion.
NOTES
[1] Following the arbitration, Enclave settled with Murray for $141,528.
[2] Plaintiff was not able to find another tenant until February 1996 and, thus, lost three months' rent as a result of Enclave's actions.