886 A.2d 1090

L.W., A MINOR, BY HIS PARENT AND GUARDIAN, L.G., AND L.G., INDIVIDUALLY, COMPLAINANTS–RESPONDENTS, v. TOMS RIVER REGIONAL SCHOOLS BOARD OF EDUCATION, RE-SPONDENT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued October 3, 2005—Decided December 7, 2005.

466

470

Before Judges A.A. RODRÍGUEZ, ALLEY and YANNOTTI.

*Thomas E. Monahan,* argued the cause for appellant (*Gilmore & Monahan,* attorneys; *Michael J. Gilmore,* on the brief).

*James R. Michael,* Deputy Attorney General, argued the cause for respondents, New Jersey Division on Civil Rights (*Peter C. Harvey,* Attorney General of New Jersey, attorney; *Andrea M. Silkowitz,* Assistant Attorney General, of counsel; *Mr. Michael,* on the brief).

*Gitanjali S. Gutierrez,* argued the cause for amicus curiae American Civil Liberties Union of New Jersey, Association for Children of New Jersey, Education Law Center, Gay Lesbian and Straight Education Network of Northern New Jersey, National Conference for Community and Justice (NJ), New Jersey Family Voices, Roxbury Parents for Exceptional Children, and Statewide Parents Advocacy Network of New Jersey (Gibbons, Del Deo, Dolan, Griffinger & Vecchione, attorneys; *Lawrence S. Lustberg, Edward L. Barocas, Jeanne LoCicero* and *Ms. Gutierrez,* on the brief).

The opinion of the court was delivered by

YANNOTTI, J.A.D.

The Toms River Regional Schools Board of Education (school district or district) appeals from a final determination of the Director of the Division on Civil Rights (Director) finding that the district violated the Law Against Discrimination (LAD), *N.J.S.A.* 10:5-1 to -49, because complainant L.W. was subjected to discrimination and harassment by other students on the basis of his perceived sexual orientation. The Director imposed equitable relief and awarded compensatory damages. We affirm in part, reverse in part and remand for further proceedings.

I.

On March 12, 1999, L.G. filed a complaint with the Division alleging that the school district violated the LAD because her son

L.W. had been repeatedly subjected to harassment by other students at the district's Intermediate West school because of his perceived sexual orientation. The district filed an answer denying the allegations. On July 10, 2000, the Director issued a finding of probable cause and referred the matter to the Office of Administrative Law for a hearing before an Administrative Law Judge (ALJ).

At the hearing, L.W. testified that, in the fourth grade, when he was a student at the South Toms River elementary school, other students referred to him at times as "gay," "homo" and "fag" in the hallways and in class. L.W. said that such comments were made "like once a week, or once a month." The remarks became more frequent when L.W. was in the fifth grade. At one point, L.W. refused to attend school because of the taunting by other students. L.W.'s teacher asked the students to write to L.W. and encourage him to return to school. He did return but the harassment did not stop. According to L.W., the harassment was worse when he was in the sixth grade.

L.W. began seventh grade at Intermediate West. L.W. was verbally harassed by other students. L.W. was called "faggot," "homo" and "butt boy." These derogatory references to L.W.'s perceived sexual orientation were made almost on a daily basis.

L.W. testified that, sometime in the fall of 1998, he found a note inserted into his school locker. Written on the note was the statement, "You're a dancer, you're gay, you're a faggot, you don't belong in our school, get out." L.W. said that he was shocked when he read the note. However, L.W. did not report the incident to his teachers or the school administrators.

On January 21, 1999, L.W. was eating lunch in the cafeteria when a group of students approached him and called him "faggot" and "homo." R.C. was one of the students. L.W. called R.C. a "whore" and she slapped L.W. on the back of his head. L.W. phoned his mother, who testified that L.W. was hysterical after this incident.

L.G. met with Raymond McCusker, the assistant principal for the eighth grade and discussed the incident. McCusker told L.G. that he would pass the information on to Irene Benn, the assistant principal for the seventh grade who was out that day. The next day, L.G. and L.W. spoke with Benn about the incident. L.W. also told Benn about the note that had been left in his locker. He informed her that he was "getting mocked and made fun of" almost every day. Benn asked L.W. whether he wanted her to speak to the students who were involved. He agreed. Benn spoke with three students. She determined that R.C. and L.W. were the two main participants in the incident. Benn counseled R.C. and L.W. and told them that their conduct was inappropriate.

L.W. testified that some of his fellow students continued to taunt him about his perceived sexual orientation. He said that he would be lucky if he made it through a day without hearing such remarks. L.W. asserted that sometime in January 1999 he was in the locker room with a group of students when W. approached him and said, "If you had a pussy I'd fuck you up and down." L.W. testified that he felt "embarrassed, vulnerable, ashamed" and sick to his stomach.

L.G. spoke to Benn about this incident. Benn wanted to speak with W. about the matter but L.W. was adamant and did not want any "problems" because he would soon be performing in a school play. L.G. told Benn that she would call her the following week and Benn should not discuss the incident with L.W. or W. until L.G. had spoken with her. L.G. never called Benn; consequently, Benn did not take any action regarding this incident.

The next incident occurred in February 1999. L.W. was at practice for a school play. L.W. testified that R.G., another student who was in the play, referred to him as "fag" or "homo" at every play practice. L.W. reported the incident to Benn, who spoke to R.G. and informed him that his comments were hurtful and inappropriate. R.G. subsequently apologized to L.W.

Later that month, L.W. went to a dress rehearsal of a play at High School North. L.W. was sitting in front of D.M., who took

his program, hit L.W. on his head repeatedly and called him "faggot" and "homo." L.W. reported this incident to Benn. Benn told D.M. that his conduct was inappropriate and there would be more severe consequences if D.M. repeated this behavior. D.M.'s mother, who was a teacher in the school, also called L.G. and apologized for D.M.'s behavior. After this incident, L.W. was not subjected to further harassment by D.M.

At or about this time, L.W. sought assistance from the school's guidance counselor. She advised him to "toughen up" and "turn the other cheek." L.G. complained to Benn about this advice.

L.G. testified that the verbal harassment was having an adverse affect upon L.W.'s school work. She stated that one of L.W.'s teachers called her and reported that L.W. was not the same boy "who walked into [her] classroom in September." He was disruptive and his grades were falling. According to L.G., when she told the teacher about the harassment, the teacher was "shocked." She had not been aware of the problem.

On March 3, 1999, another incident occurred in the gym locker room. Several students made comments to L.W. about his perceived sexual orientation. L.W. reported the harassment to the gym teacher, who informed Benn. The students involved were P.D., E.B., S.L., R.B. and J.S. Benn spoke to the students individually. She told them that their conduct was inappropriate and she warned them that there would be more severe consequences if they repeated this behavior.

The next incident occurred on March 8, 1999. L.W. testified that he was standing with other students on the lunch line in the cafeteria. He was in front of a boy, who called L.W. "gay" and a "faggot." According to L.W., the boy grabbed L.W.'s genitals, "humped" him and said, "Do you like it, do you like it like this." L.W. said he walked away but the boy followed him and "humped" him again. L.W. informed Benn, who was in the cafeteria at the time.

Benn asked L.W. to identify the boy and he pointed to M.S. Benn called M.S. over and asked him if he had been saying anything inappropriate to anyone in the lunch line. M.S. denied rubbing against L.W. He told Benn that the lunch line had been crowded. Benn also asked M.S. whether any other students were involved in this incident and he identified J.A. and C.C. Benn warned the three students that their conduct was inappropriate and if repeated, would be dealt with more severely.

After the incident in the cafeteria, L.G. told Benn that she was dissatisfied with the school's response to the harassment of her son. Several days later, the school principal Mark Regan called L.G. and scheduled a meeting with the school's administrators to discuss the matter. Accompanied by her sister, L.G. met on March 15 with Regan, Benn, McCusker and Anne Baldi, the school's affirmative action officer. L.W. attended part of the meeting. Regan and Benn explained that they were doing the best that they could in dealing with the harassment.

Benn said that an understanding was reached for handling any further incidents of harassment. L.W. would be given permission to leave class in the event of any problem. He would report any incident directly to Benn or Regan. Benn would alert L.W.'s teachers and raise their awareness to the problem. In addition, L.W. was permitted to go to any lunchroom monitor or administrator if he was harassed in the lunchroom. L.W. was assured that any student who harassed him would be dealt with immediately. First time offenders would be counseled and warned of more severe consequences if they repeated inappropriate conduct.

L.W. had remained out of school after the incident on March 8 but he returned March 16. That day, a group of students approached L.W. and called him "gay" and "homo." L.W. reported the incident. One of the students involved was C.C., who had been previously counseled by Benn concerning his involvement in the March 8 incident in the cafeteria. Benn assigned C.C. disciplinary points, which resulted in detention, and a phone call was made to his family members. The other students were counseled.

Later that day in gym class, several students made comments to L.W. about his perceived sexual orientation. One of these students was P.D., who was involved in the previous incident in the gym locker room. L.W. reported the harassment. P.D. received disciplinary points and detention. His parents were contacted and he was warned that he would be suspended if he repeated the inappropriate conduct. The other students were counseled and warned of more severe discipline if the inappropriate conduct was repeated. Afterwards, all of the students apologized to L.W.

The following day, J.S. made remarks to L.W. about his perceived sexual orientation. J.S. also had been involved in the incident in the gym locker room. Because J.S. was a repeat offender, he received detention. Benn said she spoke to J.S.'s mother and told her that the next time J.S. harassed L.W. he would be suspended.

Another incident occurred on April 13, 1999. According to L.W., a few days earlier, he was walking down the hall with his friends when a female student "dared" them to hit her buttocks. L.W. and his friends hit the student. Her brother D.R. approached L.W. on April 13 in the locker room and told him that he was a "fag" and "don't belong doing that [sic]." D.R. slapped L.W. in the face. A student who was present at the time testified that D.R. told the others, "If you looked at [L.W.], wouldn't you think he was gay?" D.R. turned to W.K. and said, "Why don't you hit this faggot right here?" W.K. removed a chain from his neck, struck L.W. with it and said, "Faggot . . . get out of here, we don't want you here." L.W. reported the incident to Benn. D.R. and W.K. were suspended for five days. Benn counseled the other students.

L.W. testified that, although some comments about his perceived sexual orientation continued after April 13, 1999, he did not complain of the harassment to Benn and the school administrators during the remainder of his time in seventh grade and during his entire year in the eighth grade. L.W. also conceded that at his

graduation from the intermediate school in June 2000, he thanked Regan for the assistance he had given to him.

L.W. started his freshman year at High School South in September 2000. L.W. testified that the harassment there began the second or third day after he started school. He stated that on the school bus he was called "fag," "homo" and "butt boy." He chose to walk rather than ride the bus because he did not want to be subjected to these comments. L.W. did not report the incidents to any teacher or school administrator.

On September 11, 2000, L.W. was walking home from school. He was a few blocks from his residence when a car pulled up in front of him. Four students were in the car. M.F. and two others got out of the car. M.F. approached L.W. and said that he heard L.W. had called M.F.'s sister a "whore." L.W. replied that it was none of his business. M.F. said, "Well, we don't like faggots, our whole family doesn't like faggots." L.W. testified that he became angry and again told M.F. that it was none of his business. M.F. punched L.W. in the face. L.W. began to cry hysterically. He ran down the street. At the corner, the car pulled up and M.F. threatened to knife L.W. if he told anyone about the incident.

L.W. called his mother, who reported the matter to the school. L.G. initially was told that because the incident had not taken place on its property, the school did not have jurisdiction in the matter. L.G. went to the police and filed an incident report. The following day, a school administrator called L.G. and informed her that, because L.W. had not crossed the threshold of his home when he was assaulted, the matter was within the school's jurisdiction. M.F. was suspended for ten days. L.W. was told that he should take the school bus but L.W. preferred to walk.

Another incident occurred on September 23, 2000 at a 7–Eleven near the high school. Students are allowed to leave school and go downtown for lunch. L.T. and several other students approached L.W. L.T. told L.W. that if he ever heard that L.W. was attracted to any one of his friends, he would "kick his ass." L.T. thereupon kicked mulch into L.W.'s face. L.W. began to cry hysterically.

L.W.'s friend called L.G., who reported the matter to Lawrence McCauley, the assistant principal. L.T. was suspended for ten days.

Afterwards, the administrators told L.G. that they could protect L.W. if he remained on school grounds for lunch but L.G. was adamant that L.W. should be allowed to go into town for lunch like the other students. L.G. told the administrators that she would not send L.W. back to school unless they could guarantee his safety. L.W. did not return to High School South.

L.G. testified that the administrators never provided any alternatives to L.W.'s attendance at High School South. L.G. explored placement in a religious school but she was informed that the district would not pay for L.W.'s attendance there. L.W. applied for admission to the Red Bank Regional High School, which has a performing arts program. L.W. auditioned and was accepted. The district agreed to bear the expense of L.W.'s attendance at the school. The district also agreed to pay L.W.'s transportation costs. L.W. completed his freshman year in Red Bank and then transferred to the Performing Arts Academy at the Ocean County Vocational and Technical School.

The ALJ rendered an initial decision in which he noted that the New Jersey courts had not yet recognized a cause of action under the LAD for peer harassment based on sexual orientation. He said if such an action were recognized, the standards for the claim would not be those applicable to workplace sexual harassment but rather the standards that apply to actions for sexual harassment by fellow students under Title IX of the Education Amendments of 1972, 20 *U.S.C.A.* §§ 1681 to 1688. Relying upon *Davis v. Monroe County Bd. of Educ.*, 526 *U.S.* 629, 119 *S.Ct.* 1661, 143 *L. Ed.*2d 839 (1999), the ALJ said that in order to prevail on such a claim, the complainant would have to show that the harassment was so severe, pervasive and objectively offensive that it denied the student access to an educational program or benefit. In addition, the claimant must show that the school district was deliberately indifferent to the harassment.

The ALJ found that L.W.'s claim failed under this test because the district had not been deliberately indifferent to L.W.'s complaints. The ALJ said that the district acted almost immediately on every reported claim of harassment at the intermediate school and applied its policy of progressive discipline to the offenders. The ALJ added that the district's approach was successful since there were few repeat offenders, the harassment ended in April 1999 and did not continue when L.W. was in the eighth grade.

The ALJ also stated that the physical abuse that L.W. experienced while attending High School South was inexcusable. But the incidents occurred off campus and both offenders had been suspended from school. The ALJ wrote, "The fact that L.W. chose not to use school transportation, and not to have lunch recess on campus, where he could be observed and protected, but rather withdrew from school voluntarily does not permit him to now claim that he was denied the benefits of education in a traditional high school setting."

In his final determination, the Director found that the LAD recognizes a claim against a school district for peer harassment based on perceived sexual orientation and the standards for evaluating such a claim are essentially the same as those that are applicable to sexual harassment in the workplace. *See Lehmann v. Toy's 'R' Us, Inc.*, 132 *N.J.* 587, 626 *A.*2d 445 (1993).

The Director concluded that L.W. had been subjected to unlawful discrimination and harassment because he was perceived to be a homosexual. The harassment, he said, was severe and pervasive and a reasonable student in L.W.'s protected class would believe that the school environment was hostile or abusive. Moreover, the Director found that the district's preventative measures had been inadequate. The handbooks distributed to parents and students did not state that discrimination or harassment based on sexual orientation was prohibited.

In addition, the Director found that, even after L.W. had been subjected to numerous instances of bias-based harassment at Intermediate West by at least eighteen different students in less

than four months, the district took no action "to unequivocally put the student body as a whole on notice that anti-homosexual harassment would not be tolerated, to clearly explain what types of conduct constitute such bias-based harassment, to explain the procedures for reporting such harassment, or that such conduct would be punished as a violation of [the district]'s anti-discrimination policies." The Director stated that a school district must "unequivocally demonstrate" to students that bias-based harassment will not be tolerated.

The Director further found that, in imposing progressive discipline upon the offending students, the district may have dealt properly with each individual offender but the administrators "failed to act appropriately in addressing the anti-homosexual hostility in the school environment as a whole." He said that

[b]y doing nothing more than responding to each individual act of harassment after it was reported, [the district] unnecessarily and unreasonably left L.W. exposed to continued bias-based hostility. [The district]'s failure to establish written procedures for staff to follow in addressing harassment complaints, or to coordinate information sharing and recordkeeping to ensure that it properly responded to the cumulative impact of the harassment rather than merely addressing the individual incidents, further supports the conclusion that [the district] is liable for the bias-based harassing environment.

The Director ordered the district to take certain remedial actions. He determined that the district's anti-discrimination policies must be "strengthened." He ordered that the student/parent handbooks, written rules, regulations and policies be revised to explicitly state that discrimination or harassment on the basis of actual or perceived sexual orientation is prohibited. These materials must be revised to include "age-appropriate" definitions of the terms "harassment" and "sexual orientation." The district also was ordered to establish written procedures for teachers, staff and administrators setting forth the manner in which they should address peer harassment based on sexual orientation. The procedures must be distributed to all staff and prominently posted in the school. The procedures must include the submission of reports concerning each incident to the affirma-

tive action office, involvement of that office and coordinated record keeping.

In addition, the Director ordered the district to establish procedures for addressing multiple acts of anti-homosexual harassment reported in the same school and not perpetrated by the same student. The Director required mandatory training of all administrators, affirmative action staff, counselors, and school nurses on how to deal with student complaints of peer harassment based on perceived sexual orientation. The district was ordered to adopt and disseminate to middle and high school students, parents and staff a policy "prohibiting harassment, intimidation or bullying based on protected characteristics including sexual orientation." The district also was directed to implement a "bullying prevention training program."

The Director awarded emotional distress damages to L.W. in the amount of $50,000. The Director found that L.W. had suffered physical and emotional pain by reason of the harassment. The Director further determined that L.G. was entitled to an award of emotional distress damages. The Director found that L.G. was an "aggrieved person" under the LAD. *N.J.S.A.* 10:5–13. He said, "Although L.G. was not herself perceived to be homosexual, she was deprived of full advantages of the public schools because her son was a member of a protected class." The Director awarded L.G. $10,000.

By order filed September 17, 2004, the Director granted the application by L.W. and L.G. for attorneys' fees and stayed pending appeal his orders mandating staff training and adoption of a "bullying prevention training program." The Director also stayed the payment provisions of his order. This appeal followed.

II.

The Board first contends that the Director erred in concluding that the LAD provides a cause of action against a school district for peer harassment based on sexual orientation. The Board further maintains that, even if such a cause of action is recognized,

the standard of liability should be the same as that applied in a Title IX action.

In determining whether the LAD recognizes a claim against a school district for peer harassment based on sexual orientation, we begin our analysis with the language of the statute. The LAD provides in pertinent part:

> All persons shall have the opportunity to obtain employment, and to obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation, publicly assisted housing accommodation, and other real property without discrimination because of race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation, familial status, disability, nationality, sex or source of lawful income used for rental or mortgage payments, subject only to conditions and limitations applicable alike to all persons. This opportunity is recognized as and declared to be a civil right.
>
> [*N.J.S.A.* 10:5-4.]

The LAD further provides that it is unlawful discrimination for

> any owner, lessee, proprietor, manager, superintendent, agent, or employee of any place of public accommodation directly or indirectly to refuse, withhold from or deny to any person any of the accommodations, advantages, facilities or privileges thereof . . . on account of the race, creed, color, national origin, ancestry, marital status, domestic partnership status, sex, affectional or sexual orientation, disability or nationality of such person. . . .
>
> [*N.J.S.A.* 10:5-12(f).]

A "place of public accommodation" includes "any kindergarten, primary and secondary school, trade or business school, high school, academy, college and university, or any educational institution under the supervision of the State Board of Education, or the Commissioner of Education of the State of New Jersey." *N.J.S.A.* 10:5-5(*l*). In addition, "affectional or sexual orientation" is defined in the LAD as "male or female heterosexuality, homosexuality or bisexuality by inclination, practice, identity or expression, having a history thereof or being perceived, presumed or identified by others as having such an orientation." *N.J.S.A.* 10:5-5(hh).

The plain language of the LAD therefore establishes that it is unlawful for a person to deny an individual the "advantages, facilities or privileges" of a public accommodation on the basis of an individual's "affectional or sexual orientation." Moreover, a public school is declared to be a place of public accommodation.

We therefore are convinced that a claim against a school district may be brought under the LAD for peer harassment that is based on an individual's "affectional or sexual orientation" if the harassment rises to the level of a denial of the "advantages, facilities or privileges" of a public school.

We are further convinced that the principles for determining whether such harassment constitutes a violation of *N.J.S.A.* 10:5–12(f) should be substantially the same as those that are employed to determine whether sexual harassment creates a hostile work environment. In *Lehmann,* the Court held that sexual harassment is a form of unlawful sexual discrimination when the harassment is "sufficiently severe or pervasive to alter the conditions of employment and create an intimidating, hostile, or offensive working environment." *Lehmann, supra,* 132 *N.J.* at 603, 626 *A.*2d 445. Such a claim may be established if the individual proves that the conduct would not have occurred but for the employee's gender, and the conduct was severe or pervasive enough to make a reasonable person believe that the conditions of employment are altered and the working environment is hostile or abusive. *Id.* at 604–07, 626 *A.*2d 445.

We recognize that in certain respects "schools are unlike the adult workplace and ... children may regularly interact in a manner that would be unacceptable among adults." *Davis, supra,* 526 *U.S.* at 651, 119 *S.Ct.* at 1675, 143 *L.Ed.*2d at 859. Nevertheless, we do not believe that the Legislature intended that students in our schools would be entitled to less protection from bias-based harassment than individuals in the workplace. Such a conclusion would be at variance with our strong public policy requiring school officials to protect children when they attend school. *See Frugis v. Bracigliano,* 177 *N.J.* 250, 268, 827 *A.*2d 1040 (2003) ("No greater obligation is placed on school officials than to protect the children in their charge from foreseeable dangers, whether those dangers arise from the careless acts or intentional transgressions of others.").

■ We also are convinced that *Lehmann* provides an appropriate framework for determining whether a school district should be liable for peer harassment in violation of the LAD. In *Lehmann*, the Court determined that an employer is directly responsible "for restoring an aggrieved employee to the terms, conditions, and privileges of employment the employee would have enjoyed but for the workplace discrimination or harassment." *Lehmann, supra,* 132 *N.J.* at 616–17, 626 *A.*2d 445. This is so because "the employer is the party with the power and responsibility to hire, promote, reinstate, provide back pay, and take other remedial action." *Id.* at 617, 626 *A.*2d 445. The employer also has the power to "impose prospective measures to prevent future discrimination and harassment in the workplace." *Ibid.*

In addition, the employer is liable for compensatory damages arising from a supervisor's creation of a hostile work environment under three possible grounds: when the employer grants a supervisor authority to control the workplace and the supervisor abuses that authority to create a hostile work environment; the employer fails to have in place anti-harassment policies, training programs, and monitoring mechanisms; or the employer knew or should have known of the harassment and failed to take effective measures to end it. *Id.* at 619–23, 626 *A.*2d 445.

■ Applying these principles to the school setting, we conclude that a school district may be required to implement equitable remedies if a student proves that he or she has been subjected to the harassment by other students on a basis declared unlawful by the LAD and such harassment creates a hostile school environment. In those circumstances, the school district may be required to implement measures to prevent future instances of peer harassment in violation of the LAD. Furthermore, the school district will be liable for compensatory damages if: the district did not have in place appropriate anti-harassment policies, training programs, and monitoring mechanisms; or the district knew or should have known of the unlawful harassment and failed to take effective measures to end it.

The district argues that we should interpret the LAD to require the same standards established by the Supreme Court for liability under Title IX for unlawful peer harassment. *Davis, supra,* 526 *U.S.* at 652, 119 *S.Ct.* at 1675, 143 *L.Ed.*2d at 859. There, the Court found that a school district will be liable only if the harassment "is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Id.* at 633, 119 *S.Ct.* at 1666, 143 *L.Ed.*2d at 847. Under *Davis,* a school district will be liable for monetary damages if the plaintiff establishes that the district acted with deliberate indifference to known acts of harassment in its programs or activities. *Id.* at 648, 119 *S.Ct.* at 1674, 143 *L.Ed.*2d at 857.

■ Although we look to federal case law for guidance when interpreting the LAD, we will depart from federal precedent without hesitation "if a rigid application of its standards is inappropriate under the circumstances." *Lehmann, supra,* 132 *N.J.* at 600–01, 626 *A.*2d 445 (quoting from *Grigoletti v. Ortho Pharmaceutical Corp.,* 118 *N.J.* 89, 107, 570 *A.*2d 903 (1990)). In our view, it would not be appropriate to apply Title IX standards to claims of peer harassment under the LAD.

There are several reasons for this conclusion. First, the standards imposed by *Davis* are more burdensome for a claimant than those established by *Lehmann* for workplace harassment and, as stated previously, we are not convinced that students in our schools are entitled to less protection from unlawful discrimination and harassment under the LAD than individuals in the workplace.

Second, *Davis* requires a showing of intentional conduct on the part of a school district for the imposition of monetary relief, whereas *Lehmann* adopts a negligence standard. We see no justification for imposing a higher hurdle for claims by students who are subject to bias-based harassment in school than that which is imposed for individuals who experience such harassment in the workplace.

Third, the Supreme Court in *Davis* explained that its rigorous standard for liability was established in part because Title IX is a funding measure enacted by Congress pursuant to its spending power and because Title IX did not expressly provide a cause of action for damages for unlawful discrimination. These considerations are not relevant to the LAD, which provides a full range of legal and equitable remedies for unlawful discrimination, not only in the workplace but also in respect to a public accommodation.

■ Last, and most important, the *Lehmann* standards more effectively advance the fundamental purpose the LAD, which is "nothing less than the eradication of the cancer of discrimination." *Lehmann, supra,* 132 *N.J.* at 600, 626 *A.*2d 445 (citing *Jackson v. Concord Co.,* 54 *N.J.* 113, 124, 253 *A.*2d 793 (1969)). The LAD is to be liberally construed to achieve that goal. *Turner v. Wong,* 363 *N.J.Super.* 186, 209, 832 *A.*2d 340 (App.Div.2003) (citing *Franek v. Tomahawk Lake,* 333 *N.J.Super.* 206, 217, 754 *A.*2d 1237 (App.Div.), *certif. denied,* 166 *N.J.* 606, 767 *A.*2d 484 (2000)).

### III.

■ We turn to the Director's findings of fact and his award of equitable relief and monetary damages. The scope of our review of these determinations is well-established. "In light of the executive function of administrative agencies, judicial capacity to review administrative actions is severely limited." *George Harms Constr. v. Turnpike Auth.,* 137 *N.J.* 8, 27, 644 *A.*2d 76 (1994). We can intervene only "in those rare circumstances in which an agency action is clearly inconsistent with its statutory mission or with other State policy." *Ibid.* We must determine whether the agency's action is arbitrary and unreasonable and, in doing so, we consider whether the agency's action violates express or implied legislative policies and whether there is substantial evidence in the record to support the agency's factual findings. *Ibid.* If there is sufficient evidential support in the record, we must uphold the agency's findings even though we may have reached a different conclusion in weighing and considering the evidence. *In re Tay-*

*lor*, 158 *N.J.* 644, 657, 731 *A.*2d 35 (1999) (citing *Clowes v. Terminix Int'l, Inc.*, 109 *N.J.* 575, 588, 538 *A.*2d 794 (1988)).

A. *Hostile School Environment*

We are satisfied that there is sufficient evidence in the record to support the Director's finding that L.W. was subjected to severe or pervasive harassment on the basis of his perceived sexual orientation. It is virtually undisputed that L.W. was subjected to a series of incidents of harassment by his fellow students in which he was taunted and physically assaulted on the basis of the perception that he was a homosexual. He was called "gay," "homo" and "faggot." A student grabbed L.W.'s genitals and engaged in a simulated sexual act while he waited in line in the school cafeteria. L.W. was told in no uncertain terms that he was not welcome in the school because it was believed he was a homosexual. He was slapped, punched and struck with a neck-chain and the statements of the perpetrators of these physical assaults make clear that the students involved intended to harass, harm and demean L.W. based on his perceived sexual orientation. In the circumstances, a reasonable person in L.W.'s protected class would believe that the school environment was hostile and threatening.

Judge Alley states in his dissent that the incidents of harassment at issue were "occasional, not pervasive" and the efforts of the school staff and administrators dispelled to some degree "the portrayal of the entire school environment as hostile." *Infra* at 502, 886 *A.*2d at 1112. We note, however, that a hostile environment can be created by harassment that is "sufficiently severe *or* pervasive." *Lehmann, supra,* 132 *N.J.* at 603, 626 *A.*2d 445 (emphasis added). A single incident of harassment may, in certain circumstances, create a hostile work environment. *Taylor v. Metzger,* 152 *N.J.* 490, 501–02, 706 *A.*2d 685 (1998). We are convinced that the evidence in this case supports a finding that the harassment was both "severe" and "pervasive" and that a person

in L.W.'s protective class could reasonably believe that the school environment was hostile or abusive.

B. *Liability*

1. *Preventive Mechanisms*

We next consider the Director's finding that in 1999–2000 the district's mechanisms to prevent peer harassment on the basis of sexual orientation were inadequate.

In 1997, the district adopted a revised affirmative action plan.[1] The plan noted that state statutes prohibit discriminatory practices in employment or educational opportunity on the basis of "affectional or sexual orientation." The plan stated that the district "shall maintain an instructional and working environment that is free from harassment of any kind" including sexual harassment which was designed to include unwelcome sexual advances, requests for sexual favors and other verbal or physical conduct "of a sexual nature."

The student/parent handbooks distributed by Intermediate West and High School South also stated that certain forms of discrimination were unlawful but failed to mention that discrimination on the basis of sexual orientation was prohibited. Nevertheless, the handbooks made clear that the district was "committed to maintaining an instructional and working environment that is free of harassment of *any* kind." (Emphasis added).

In addition, the handbook distributed by Intermediate West stated that pupils who engage in inappropriate behavior may be suspended or expelled for, among other things, a physical assault upon any pupil, teacher or school employee, or the use of profanity or other "abusive language." The handbook distributed by High School South stated that any physical assault on a student, teacher

---

[1] The plan was adopted pursuant to regulations promulgated by the Commissioner of Education. *N.J.A.C.* 6:4–1.1 to –1.10. The regulations were repealed and replaced by regulations codified at *N.J.A.C.* 6A:7–1.1 to 1.10. *See* 35 *N.J.R.* 2503 (June 2, 2003).

or school employee would result in suspension or expulsion. The handbook also stated that:

> No student should be intimidated by his or her peers because of physical differences, ethnic background, disabilities, differences of opinion, etc. Sexual harassment in any form will not be tolerated. Students who harass other students will be disciplined by the administration, suspended from school pending a parent conference, will be brought before the District Affirmative Action Officer and may be subject to a police complaint/charges.

We agree with the Director that the statements in the student/parent handbooks should have included an explicit prohibition of discrimination and harassment on the basis of sexual orientation. But we are not convinced that this deficiency is a sufficient basis to impose compensatory damages upon the district.

In our view, students at Intermediate West and High School South could not have been under the impression that the sort of discrimination and harassment they inflicted upon L.W. was permitted. The handbooks put the students squarely on notice that harassment of *any* kind was prohibited. Moreover, as the Director notes in his decision, some of the conduct directed at L.W. was "sexual in nature" and such conduct was explicitly proscribed as a form of sexual discrimination. In addition, L.W. was subjected to physical assaults which were clearly declared to be grounds for suspension or expulsion.

In short, the absence of an explicit statement in the student handbooks that discrimination and harassment on the basis of sexual orientation is not a basis for the award of monetary damages where, as here, the written materials provided by the schools were sufficient to place students on notice that physical assaults and harassment of *any* kind were prohibited.

### 2. *Measures to end the harassment*

The Director found that the district knew or should have known of the harassment of L.W. and failed to take effective measures to end it. " 'Effective' remedial measures are those reasonably calculated to end the harassment." *Lehmann, supra,* 132 *N.J.* at 623, 626 *A.2d* 445. Timeliness of the response is a

significant factor in determining whether an anti-harassment program is effective. *Payton v. New Jersey Turnpike Auth.*, 148 *N.J.* 524, 537, 691 *A.*2d 321 (1997).

As we stated previously, L.W.'s first complaint of harassment was made on January 21, 1999. Thereafter, L.W. was subjected to a series of incidents of harassment at the intermediate school that ended on April 13, 1999. L.W. completed seventh grade and eighth grade without any further reported harassment.

▪ We nevertheless are convinced that there is sufficient credible evidence in the record to support the Director's finding that the measures taken by the administrators at Intermediate West were not effective. Benn's disciplinary approach involved counseling of the students who were involved in each incident of harassment and more severe discipline in the event the conduct was repeated. The record supports the Director's finding that this disciplinary approach was not effective because it failed to stop certain offenders from repeating their harassing conduct. Furthermore, the discipline imposed was not sufficient to deter other students from becoming first time offenders. The district adhered to its ineffective policy despite recurring instances of harassment. The Director properly found that the district's remedial measures unreasonably left L.W. exposed to continued bias-based harassment by his fellow students.

▪ The Director also found that the district failed to address the "anti-homosexual hostility in the school environment as a whole." However, the evidence does not support this finding. The record shows that in 1999, there were about 1,300 students at Intermediate West. Only eighteen students were directly involved in the harassment at issue here. There is no evidence of "anti-homosexual hostility" in the school as a whole. Even so, from the perspective of a reasonable person in L.W.'s protected class, the harassment was severe or pervasive enough to create a hostile and abusive school environment.

The district argues that its policy of progressive discipline at Intermediate West was effective because L.W.'s complaints of harassment ended after the April 13, 1999 incident. However, the Director found that that district should have brought the harassment to an end sooner. L.W. was the target of bias-based discrimination and harassment at Intermediate West for about three months. The district's failure to take effective remedial action allowed the problem to grow and worsen. We are convinced that there is sufficient credible evidence in the record to support the Director's finding that the district's delay in ending the harassment was unreasonable.

We also are satisfied that there is sufficient evidence in the record for the Director's finding that the district did not effectively respond to the two incidents that occurred when L.W. was in high school. The district was on notice that L.W. had been the target of discrimination and harassment on the basis of his perceived sexual orientation when he was in seventh grade. L.W. testified that the harassment began again shortly after he started high school in the fall of 2000. He chose not to ride the school bus because of the derogatory comments made to him about his perceived sexual orientation but he never informed the school officials of the harassment. In these circumstances, the district could not have been expected to prevent the physical assault that occurred off school grounds on September 11, 2000.

However, after that incident, the high school administrators were aware that L.W. was a potential target for further bias-based peer harassment. The administrators suspended the student who punched L.W. but other students were involved in the September 11, 2000 incident. The suspension of one student failed to deter the incident that occurred less than two weeks later. L.W. testified that the school provided security to students who went into town during the lunch break. There is no evidence that prior to the second incident the district alerted its security guard to the potential for another assault upon L.W.

The school administrators told L.G. that her son could be protected if he rode the school bus and ate his lunch in school. This response was clearly inappropriate. L.W. was entitled to walk to and from school and eat lunch in town free from discrimination and harassment on the basis of his perceived sexual orientation. The district's remedial measures should have been designed to alter the behavior of the harassers, not the person who was harassed.

The district argues that it did not deny L.W. an educational opportunity; rather, L.G. elected to withdraw her son from the high school. However, L.W. had been physically assaulted twice in less than two weeks. The district failed to put in place effective measures to prevent further bias-based peer harassment of L.W. L.G. believed that her son would not be protected from physical attacks by other students if he remained at High School South. We are convinced that, in the circumstances, her decision was reasonable.

Our dissenting colleague states that the record is not sufficient for determining whether the district's remedial measures were reasonable or unreasonable because there is no evidence concerning how other school districts deal with similar incidents of harassment. *Infra* at 502–03, 886 *A.*2d at 1112. We are convinced, however, that the record provides sufficient credible evidence for the Director's finding that the district's remedial actions were ineffective. We are satisfied that the issue of whether the District acted reasonably in addressing the harassment of L.W. should be determined based on what the District did or failed to do rather than upon how other districts have dealt with similar situations.

C. *Equitable Remedies*

1. *Anti–Discrimination Policies and Procedures*

As we stated previously, the Director ordered the school district to revise its student/parent handbooks, written rules, regulations and policies to explicitly state that discrimination or harassment based on actual or perceived sexual orientation is

prohibited. The Director mandated that the district establish and disseminate written procedures to teachers, staff and administrators on the manner in which they are to address complaints of peer harassment based on perceived sexual orientation. In addition, the Director ordered the district to provide mandatory training for all administrators, the affirmative action staff, counselors, school nurses and others who deal with student complaints of discrimination and harassment based on actual or perceived sexual orientation. The Director further required the dissemination and publication of the district's anti-discrimination policies to all parents, students, teachers and the public.

We are not persuaded that the record supports the imposition of these remedial measures. The discrimination and harassment complained of in this case occurred in 1999 and 2000. In 2003, the Commissioner of Education adopted regulations which are intended to ensure that all students are provided equal access to educational programs and services. *N.J.A.C.* 6A:7–1.1 to –1.10. The regulations provide, among other things, that each district board of education must adopt and implement written "educational equity policies" that:

1. Recognize and value the diversity of persons and groups within the society and promote the acceptance of persons of diverse backgrounds regardless of race, creed, color, national origin, ancestry, age, marital status, *affectional or sexual orientation*, gender, religion, disability or socioeconomic status; and

2. Promote equal educational opportunity and foster a learning environment that is free from all forms of prejudice, discrimination and harassment based upon race, creed, color, national origin, ancestry, age, marital status, *affectional or sexual orientation*, gender, religion, disability or socioeconomic status in the policies, programs and practices of the district board of education.

[*N.J.A.C.* 6A:7–1.4(a) (emphasis added).]

The equity plan must address professional development and equality in school and classroom practices. *N.J.A.C.* 6A:7–1.4(c)(2).

Each district board of education is required to provide professional training of all school personnel to address "inequities arising from prejudice" on the basis of, among other things, "affectional or sexual orientation." *N.J.A.C.* 6A:7–1.6(a). Parents and other community members must be invited to participate in the

professional development training. *N.J.A.C.* 6A:7–1.6(a)(2). The plan also must ensure "equal and bias-free access for all students to all school facilities, courses, programs, activities and services," without regard to certain factors including "affectional or sexual orientation." *N.J.A.C.* 6A:7–1.7(a).

Every district must develop a "comprehensive equity plan" every three years, "which shall identify and correct all discriminatory and inequitable educational and hiring policies, patterns, programs and practices affecting its facilities, programs, students and staff." *N.J.A.C.* 6A:7–1.4(c). The plan must be submitted to the county superintendent of schools for approval, and the district must provide a copy of the plan to the Department of Education. *N.J.A.C.* 6A:7–1.4(c)(4). Each district is required by *N.J.A.C.* 6A:7–1.4(b) to inform the "school community" of its policies.

In view of these comprehensive regulatory requirements, we are not convinced that the remedial measures ordered by the Director are warranted. The record does not include the "educational equity policies" adopted by the district as required by the Commissioner's regulations. Those policies may, in fact, address the very concerns identified by the Director in his final decision. Indeed, Anne Baldi, the district's affirmative action officer, testified that in the equity plan in effect in 2003, the district has shifted its focus from discrimination on the basis of race and religion to sexual harassment including harassment based on sexual orientation. Moreover, there is no evidence of any district-wide problem with peer harassment on the basis of sexual orientation. There also is no evidence of any such harassment in the district's schools since L.W.'s harassment in 1999 and 2000.

We recognize that there may be circumstances where a school district might be required by the Director to implement anti-discrimination policies and procedures in addition to those adopted pursuant to the Commissioner's regulations. The record in this case does not provide a basis to impose such measures. Therefore, we reverse those provisions of the order requiring the district to adopt the aforementioned remedial measures and we

remand to the Director for reconsideration of those mandates in light of the "educational equity policies" adopted by the district and any other actions taken to address peer harassment on the basis of sexual orientation.

## 2. *Anti–Bullying Measures*

In *N.J.S.A.* 18A:37–15, the Legislature required each school district to adopt a policy prohibiting harassment, intimidation and bullying on school property. The prohibited conduct includes "any gesture or written, verbal or physical act that is reasonably perceived as being motivated" by among other things, race, color, religion, ancestry, national origin, gender and sexual orientation. *N.J.S.A.* 18A:37–14. Each school district is "encouraged" to establish bullying prevention programs. *N.J.S.A.* 18A:37–17. The Commissioner of Education is granted authority to implement these statutory requirements. He is required to assist school districts by developing model policies applicable to grades kindergarten to twelve. *N.J.S.A.* 18A:37–15(d). Moreover, the Commissioner may consider applications from school districts for reimbursement of costs incurred to implement the law. *N.J.S.A.* 18A:37–19.

In this case, the Director ordered the district to adopt and disseminate to students, parents and staff a policy prohibiting harassment, intimidation or bullying based on "protected characteristics, including sexual orientation." He also ordered the district to implement a bias-based harassment prevention training program, including age-appropriate components on bias-based bullying, intimidation and harassment based on sexual orientation, "as recommended by *N.J.S.A.* 18A:37–17." The Director ordered that this program be required for middle and high school students and staff.

In our view, the Director does not have authority to order a school district to comply with the anti-bullying statutes. The Legislature has conferred authority to enforce the anti-bullying statutes upon the Commissioner of Education. The provisions of

the order mandating compliance with *N.J.S.A.* 18A:37–15 and *N.J.S.A.* 18A:37–17 are therefore reversed.

### D. *Compensatory Damages*

The Director awarded L.W. $50,000 as damages for his emotional distress. The district argues that the award should be set aside because the Director is limited to awarding "incidental" monetary relief. The district also contends the award is excessive. We disagree.

■ The LAD was amended in 2003 to provide that "a prevailing complainant may recover damages to compensate for emotional distress . . . to the same extent as is available in common law tort actions." *L.* 2003, *c.* 180, § 16, now codified at *N.J.S.A.* 10:5–17. The amendment was intended to "clarify" that complainants in proceedings before the Division could recover emotional distress damages to the same extent as plaintiffs in the Superior Court. *See* Sponsors' Statement to Assembly Bill No. 3774, at 32 (June 12, 2003). Although the LAD was amended after the events at issue here, the Director properly awarded relief consistent with the amended statute.

■ We apply a two-part test to determine whether a statute should apply retrospectively. The first inquiry is "whether the Legislature intended to give the statute retroactive application." *In re D.C.*, 146 *N.J.* 31, 50, 679 *A.*2d 634 (1996) (quoting *Phillips v. Curiale*, 128 *N.J.* 608, 617, 608 *A.*2d 895 (1992)). The second question is "whether retroactive application of that statute will result in either an unconstitutional interference with 'vested rights' or a 'manifest injustice.'" *Ibid.*

The amendment to *N.J.S.A.* 10:5–17 took effect four months after its enactment on September 12, 2003. *L.* 2003, *c.* 180, § 28. We are convinced that the Legislature intended the amendment to apply to matters that were pending as of that date. In this regard, we emphasize again the LAD is remedial legislation that should be liberally construed to achieve it stated purposes. *Tur-*

*ner, supra,* 363 *N.J.Super.* at 209, 832 *A.2d* 340. Furthermore, application of the amendatory statute does not affect a "vested right" or represent a "manifest injustice." *In re D.C., supra,* 146 *N.J.* at 50, 679 *A.2d* 634. There would have been no limit on the amount of emotional distress damages that could have been awarded against the district if this matter had been brought in court rather than in an administrative forum.

 We are further convinced that there is substantial credible evidence to support the Director's finding that L.W. suffered "humiliation, embarrassment and indignity" by reason of the harassment he experienced in school. *Tarr v. Ciasulli,* 181 *N.J.* 70, 81, 853 *A.2d* 921 (2004). In our view, the award of $50,000 is not excessive.

 Finally, the Director awarded L.G. $10,000 for her emotional distress. The Director found that L.G. was an "aggrieved" person under *N.J.S.A.* 10:5–13. The district argues that the award has no basis in law. We agree.

We have no doubt that L.G. was sorely distressed by the harassment of her son. However, the LAD does not provide a remedy for L.G. *See Catalane v. Gilian Instrument Corp.* 271 *N.J.Super.* 476, 500, 638 *A.2d* 1341 (App.Div.), *certif. denied,* 136 *N.J.* 298, 642 *A.2d* 1006 (1994) (holding that *per quod* damages are not available under the LAD because the Legislature "did not intend to establish a cause of action for any person other than the individual against whom the discrimination was directed.")

The Director argues that pursuant to our decision in *Berner v. Enclave Condominium Ass'n, Inc.,* 322 *N.J.Super.* 229, 730 *A.2d* 877 (App.Div.), *certif. denied,* 162 *N.J.* 131, 741 *A.2d* 98 (1999), the award to L.G. was permissible. In *Berner,* we determined that the LAD permitted a claim by a white condominium owner that defendant refused to permit him to lease his unit to an African–American. *Id.* at 231, 730 *A.2d* 877. We held that in these circumstances the lessor was an "aggrieved person." *Id.* at 234–35, 730 *A.2d* 877.

We relied in *Berner* upon our earlier decision in *O'Lone v. New Jersey Dep't of Corrections,* 313 *N.J.Super.* 249, 255, 712 *A.2d* 1177 (App.Div.1998), where we held that the plaintiff could bring a claim under the LAD based on an allegation that he had been discharged from employment because his girlfriend was an African–American. We determined in *O'Lone* that regardless of his race, the plaintiff was a person who was "aggrieved" by the unlawful discrimination. He was, in these circumstances, the "functional equivalent" of a member of the protected class. *Ibid.*

Neither *Berner* nor *O'Lone* support an award of damages to L.G. in this case. L.G. was not the "functional equivalent" of a member of the protected group. L.G. was not denied the advantages of a public education by reason of the bias-based harassment experienced by her son. Therefore, L.G. is not an "aggrieved" person under *N.J.S.A.* 10:5–13 and the Director erred in awarding damages to her for emotional distress. The award to L.G. is reversed.

Affirmed in part, reversed in part and remanded to the Director for further proceedings in conformity with this opinion.

ALLEY, J.A.D. (dissenting in part).

I am unable to join fully in the views of my colleagues as expressed so ably in Judge Yannotti's opinion. My divergence is limited to so much of the majority decision as affirmed an award of damages and counsel fees to L.W., and I dissent to that extent.

Certainly, I join my colleagues in recognizing that harassment of a public school student based on his or her sexual orientation is forbidden by the LAD, and also that vigorous steps are warranted to accomplish its eradication. Similarly, bullying of students also should be rooted out. Nor do I mean to minimize the anguish and fear that the complained-of incidents of harassment and bullying must have inflicted on L.W. and his mother.

As the majority ventures, it may be that the remedial measures taken by the school in this case ultimately were not as effective as

we would have preferred. But the real question is whether there was a "hostile school environment," and this involves considerations that may not have been given their full due.

Thus, incidents of discrimination against L.W. took place, not in a vacuum, but in the context of actions by the school and its responsible officials that on balance were supportive of L.W., aimed at making his school environment congenial, and designed to punish those who engaged in the harassment. When the efforts of the school staff and administration are reckoned, they dispel, at least to a substantial extent, the portrayal of the entire school environment as hostile. The incidents that led to the disciplining of offending students were occasional, not pervasive, and hostility did not characterize the conduct or attitude of the school.

Indeed, when evaluating the conduct of the school and its officials, it is helpful to recognize how different the situation here was from the facts that obtained in *Frugis v. Bracigliano*, 177 *N.J.* 250, 268, 827 *A.*2d 1040 (2003), cited by the majority. In *Frugis*, the facts were dominated by incidents of recurring abuse of students by a principal, often right in his school office and in rather conspicuous circumstances. Although the principles enunciated in *Frugis* are indeed valuable, the dramatic difference between the circumstances here and those in *Frugis* limits the usefulness of the comparison.

The Director's determinations with respect to the reasonableness or unreasonableness of the remedial actions of the school and its staff cannot be sustained on the present record. The Director's determinations necessarily assume that those actions were unreasonable. But in the absence of proofs regarding how problems of this nature are addressed, including with respect to the nature of the discipline imposed on students who have discriminated, by at least some of the hundreds of other schools in the State, there is no basis for comparing this District with others, and thus no real standard of judging the reasonableness of what was done here. The same can be said for the lack of any meaningful information in this record as to how the District's

actions compared to what may or may not have been required at the time by the Commissioner of Education. To judge the District and its staff in the absence of such proofs, which must have been readily obtainable by the Director, is in essence arbitrary. The Director cannot reliably know that the type of incidents that occurred here were reasonably stoppable by the school without proof that they were stoppable by other similarly situated schools.

I would reverse the Director's award to L.W. of damages and counsel fees and dissent from our affirmance of that award.