915 A.2d 535

L.W., A MINOR, BY HIS PARENT AND GUARDIAN, L.G., AND L.G., INDIVIDUALLY, COMPLAINANTS, v. TOMS RIVER REGIONAL SCHOOLS BOARD OF EDUCATION, RESPONDENT–APPELLANT.

Argued November 13, 2006—Decided February 21, 2007.

382

386

*Thomas E. Monahan,* argued the cause for appellant (*Gilmore & Monahan,* attorneys; *Michael J. Gilmore,* on the briefs).

*James R. Michael,* Deputy Attorney General, argued the cause for respondent New Jersey Division on Civil Rights (*Stuart Rabner,* Attorney General of New Jersey, attorney; *Andrea M. Silkowitz,* Assistant Attorney General, of counsel).

*Lawrence S. Lustberg,* argued the cause for *amici curiae,* American Civil Liberties Union of New Jersey, Association for Children of New Jersey, Education Law Center, Gay Lesbian and Straight Education Network of Northern New Jersey, National Conference for Community and Justice (NJ), New Jersey Family Voices, Roxbury Parents for Exceptional Children, and Statewide Parents Advocacy Network of New Jersey (*Gibbons, Del Deo, Dolan, Griffinger & Vecchione,* attorneys; *Emily B. Goldberg,* on the letter in lieu of brief).

Chief Justice ZAZZALI delivered the opinion of the Court.

In this appeal, we must determine whether a school district may be held liable under the New Jersey Law Against Discrimination (LAD or Act), *N.J.S.A.* 10:5–1 to –49, when students harass another student because of his perceived sexual orientation and, if so, what standard of liability governs such a cause of action.

In the fourth grade, classmates began taunting plaintiff L.W. with homosexual epithets such as "gay," "homo," and "fag." The harassment increased in regularity and severity as L.W. advanced through school. In seventh grade, the bullying occurred daily and escalated to physical aggression and molestation. Within days of entering high school, the abuse culminated with a pair of physical attacks. Ultimately, L.W.'s unease prompted him to withdraw from his local high school and enroll elsewhere, at the expense of his school district.

Thereafter, on her son's behalf, L.W.'s mother filed a complaint under the LAD, alleging that the Toms River Regional Schools Board of Education (District) failed to take corrective action in response to the harassment L.W. endured because of his perceived sexual orientation. The Director of the Division on Civil Rights (Director) held that the District was liable for the student-on-student harassment that L.W. repeatedly endured. The Appellate Division affirmed the Director's decision.

■ Because the Act's broad statutory language is clear, we hold that the LAD recognizes a cause of action against a school

district for student-on-student affectional or sexual orientation harassment. We also hold that a school district is liable for such harassment when the school district knew or should have known of the harassment but failed to take actions reasonably calculated to end the mistreatment and offensive conduct. Our conclusion furthers the legislative intent of eradicating the scourge of discrimination not only from society, but also from our schools, thus encouraging school districts to take proactive steps to protect the children in their charge.

I.

As a fourth-grader at South Toms River Elementary School, L.W. first heard the taunts—"you're gay, you're a homo, you're a fag." Initially, L.W. did not understand the teasing and asked his aunt, "what does 'gay' mean? ... [T]hat's what everyone says I am, so what does it mean?" In fifth and sixth grade, the frequency of the ridicule increased from once a month or once a week to almost daily. Only then did school officials learn of the problem. At one point during the fifth grade, L.W. became so upset that he refused to attend school. Following a complaint by his mother, L.W.'s classmates wrote apology letters. L.W. returned to school, but the problem continued.

### Middle School

The harassment escalated in 1998 when L.W. enrolled at Intermediate West for seventh grade, a school with an enrollment of 1,400 students. "Almost every single day" classmates directed slurs at L.W. loudly in the halls "so everyone could hear." When asked about his day, L.W. would occasionally reply, "Nobody called me anything today. I had a good day." But, on entering the seventh grade, the maltreatment was no longer limited to verbal disparagement. In the fall, L.W. discovered a piece of construction paper attached to his locker that read, "You're a dancer, you're gay, you're a faggot, you don't belong in our school,

get out." L.W. did not immediately report the incident to school officials.

The first reported incident occurred in late January. While in the school cafeteria, a group of ten to fifteen students surrounded L.W. One of those students, R.C., then struck L.W. on the back of the head and taunted him with "the usual" homosexual epithets. L.W. went to the office and called his mother. When she arrived to pick L.W. up, eighth-grade Assistant Principal Raymond McCusker informed her that he would report the incident to seventh-grade Assistant Principal Irene Benn. The next day, L.W. remained home from school, still upset from the previous day's events. His mother called Benn four times that day to determine what action was taken in response. Benn advised L.W.'s mother that McCusker had briefed her on the incident, but because "something had come up," she "did not have time to speak to the children involved." The following day, Benn informed L.W.'s mother that she had spoken with the main participants and determined that R.C., after being called a "whore" by L.W., retaliated against him. Benn counseled both students regarding the inappropriateness of their behavior and warned them of the consequences of future actions. Benn did not punish or reprimand any of the other students involved.

Also in late January, a student approached L.W. in the locker room and, with a crowd of students looking on, said, "If you had a p* * * *, I'd f* * * you up and down." L.W. was "[e]mbarrassed, vulnerable, [and] ashamed." L.W. and his mother reported the incident to Benn, but because L.W. did not want any problems performing in the upcoming school play, his mother asked Benn to wait until after the performance to speak with the offending student. However, L.W.'s mother did not follow up with Benn, and no action was taken.

Even the school play was not free of harassment. At every practice, an eighth grade student, R.G., insulted L.W. with derogatory comments. L.W. reported the harassment, and R.G. apologized. Further, as part of a school function, L.W. went to Toms

River High School North to watch a dress rehearsal of a school play. There, D.M. mocked L.W. and smacked him on the head with his playbill. L.W. reported the incident. Benn counseled D.M., advising him that further inappropriate conduct would result in more significant consequences. D.M.'s mother was advised of the incident. She apologized to L.W.'s mother and insisted that D.M. write a letter apologizing to L.W.

The insults such as "butt boy, fruit cake, [and] fudge [p]acker" did not abate. The remarks were so frequent in seventh grade that L.W. testified that "[i]f I ma[d]e it through a day without comments, I was lucky." For example, various students pestered L.W. during physical education. When L.W. informed Benn of the badgering, she discouraged the heckling students from using such language and warned them of future consequences if their behavior continued. In addition to reporting the incidents to Benn, L.W. sought the help of his guidance counselor who urged L.W. to "toughen up and turn the other cheek." L.W.'s mother complained to Benn about the guidance counselor's advice.

The harassment at Intermediate West peaked in mid-March. While standing in the lunch line, M.S., along with two friends, J.A. and C.C., approached L.W., calling him "gay" and "faggot." M.S. then grabbed L.W.'s "private area" and "humped" him, taunting, "Do you like it, do you like it like this?" L.W. escaped, but M.S. followed him and repeated the molestation as classmates watched. L.W. then fled to the school's main office. Benn spoke with all three attackers, told them that their conduct was "inappropriate" and that, if repeated, "it would be dealt with more severely." The assaulting students then returned to class.

L.W.'s mother arrived at school shortly thereafter to pick up her son, who waited in the school's main office while his mother and Benn spoke. Even in the main office, students teased L.W. Following the cafeteria incident, L.W. did not attend school for several days. When he did return, Mark Regan, Principal of Intermediate West, Anne Baldi, the school's affirmative action officer, Benn, and McCusker met with L.W.'s mother and aunt.

At that meeting, held less than two months after the first reported incident of harassment, Regan informed L.W.'s mother that an "open door policy" would be imposed, permitting her son to leave class and report problems directly to him or Benn any time anyone bothered him. Further, Regan assured L.W.'s mother that her son's teachers would be informed of the situation and L.W.'s special permission to leave class. Finally, Regan stated that harassing students would be dealt with immediately. According to Regan, first-time offenders would be counseled and more drastic action would be taken against repeat offenders.

On his first day back to school, L.W. faced homosexual taunts from his schoolmates, namely, C.C., B.E., and T.L. School officials reacted. Because C.C. was a repeat offender, his family was contacted and he received detention, while Benn and McCusker counseled the first-time-offenders on the consequences of their behavior. Later that same day, R.B., P.D., J.P., and T.S. told L.W. that he should "be in a girls['] locker room." As a repeat offender, P.D. was punished with detention, his parents were contacted, and he was warned that he would be suspended if he offended again. The others, all first-time-offenders, were counseled. L.W.'s gym locker was also moved closer to the physical education office.

The next month, in April of his seventh grade year, L.W. slapped a female student's buttocks on her dare. Thereafter, the female student's brother, D.R., accompanied by W.K., confronted L.W. in the locker room and said, "I heard [you] smacked my sister on her a* *, I don't want you to do that, you're a fag, you don't belong doing that." D.R. then slapped L.W. across his face, ordering him "never to touch his sister again." Laughing and saying "Faggot ... get out of here, we don't want you here," W.K. then "whipped" L.W. over the back of his neck with a silver chain. L.W. reported the incident before going home that day. When his mother arrived, L.W. was crying. He had "welts" on his neck, and his cheek was "all red" from the attack. School officials

suspended D.R. and W.K. five days each. L.W. did not return to school for over a week.

Although unreported, the verbal abuse persisted through the end of the seventh grade, but was of a lesser degree. Eighth grade was a better year for L.W. Although the verbal harassment continued, it was more sporadic. No physical abuse was reported, and, at L.W.'s graduation, L.W. and his mother thanked Regan for "giving L.[W.] a good year." Concerning the lack of physical confrontation during his eighth grade year, L.W. testified that a security guard monitored him between classes approximately eighty percent of the time. However, the guard, a former police officer, testified that he was assigned to the intermediate school generally and that he was not assigned specifically to monitor L.W. Although the security guard was transferred to Toms River High School South when L.W. entered that school as a freshman, the guard stated that the transfer was unrelated to L.W.'s academic progression.

Throughout L.W.'s time at Intermediate West, a school-wide non-discrimination policy was in effect, one that the District characterized as a "zero tolerance" policy. The District provided students and parents with a handbook of rules, regulations, and policies stating that the District does not discriminate on the basis of numerous characteristics including race, sex, and religion. However, the handbook did not enumerate affectional or sexual orientation. Additionally, the District, which oversees roughly 18,000 students, maintained a second nondiscrimination policy, an affirmative action overview. That policy was not generally distributed to students and parents; rather, it was maintained by the District's superintendent, principals, and affirmative action office. The affirmative action overview enumerated "affectional or sexual orientation" as a prohibited basis for discrimination.

Benn testified that she explained the school's non-discrimination policies to students in a class period at the beginning of the academic year. However, E.C., a classmate of L.W.'s, testified that the assembly addressed mostly "fighting" and "yelling in the

hall." To the extent harassment was discussed, according to Benn, no specific reference was made to sexual orientation. The District did not reinforce the discrimination policy through assemblies, letters to parents, or any other widespread communication.

The District employed "progressive discipline" when addressing peer discrimination and harassment. School officials counseled first-time offenders regarding their inappropriate conduct and advised them that more serious consequences would result if the conduct recurred. For a second transgression, the offender earned disciplinary "points." A third offense could result in suspension. By way of comparison, if a student was more than one minute late for class, the student received three "points" and a detention. Overall, the progressive discipline was student-specific, predicated on the offender's prior record, not the victim's identity or history.

### *High School*

On entering High School South, the epithets resurfaced. To avoid the derision he encountered on the school bus, L.W. decided to walk home after school. However, while walking home from school in early September and off school grounds, a car approached L.W. and three students, L.B., J.F., and M.F., exited. M.F. said, "I heard you have a crush on L.B., and that [his] family doesn't like faggots, [he doesn't] like faggots." J.F. pressed L.W., "Well, are you a faggot?" M.F. chimed in, "We don't like faggots, our whole family doesn't like faggots." L.W. yelled, "It's none of your damn business." M.F. then punched L.W. in the face, knocking him down. L.W. ran away, crying hysterically, but M.F. chased after him threatening, "If I hear that you said anything about this I'm going to knife you." L.W. subsequently missed a day or two of school.

In the wake of the attack, L.W.'s mother informed high school officials of the mistreatment her son endured in middle school. According to L.W.'s mother, the educators seemed unaware of L.W.'s past. The District suspended M.F. for ten days, and he

later pled guilty to a charge of assault. School officials advised L.W. to take the bus home in the future.

The final incident occurred in mid-September when L.W. went to downtown Toms River for lunch, as many students did. L.T. approached L.W., who was sitting on a curb outside a 7–Eleven convenience store. Unprovoked, L.T. pushed L.W. to the ground and grabbed L.W.'s shirt. L.T. warned L.W. that if he ever heard that L.W. had a crush on him or his friends again that he'd "kick [L.W.'s] a* *." The aggressor then "completely covered" L.W. with dirt. The District suspended L.T. for ten days.

L.W. never returned to High School South, but instead withdrew from the District to attend school elsewhere. During the following month, his mother attempted to find alternative placement for L.W., without assistance from the District. After his mother expressed an interest in Red Bank Regional High School, the District agreed to subsidize L.W.'s attendance and transportation expenses. Enrolled in Red Bank Regional's performing arts program, L.W. completed his freshman year without encountering "one single problem." The next year, because of the transportation burden on his family, L.W. transferred to Ocean County Vocational Technical School, Career and Technical Institute.

L.W. described his time as a student in the District as "very upsetting." Indeed, L.W. stated that he felt as if he missed his "teenage years." Prior to the harassment, family members described L.W. as "a very happy child." After the maltreatment, his family described him as "depressed," "fearful," and "withdrawn." According to his mother, he "was not . . . the same kid that he was years before." L.W. had difficulty paying attention in class, a problem that negatively impacted his academic performance. In fact, in seventh grade, a teacher called L.W.'s mother to express her concerns. The teacher reported that L.W. was "not the same boy who walked into my classroom in September. He's disruptive[, and] his grades are falling." His mother cited the harassment as the cause, a revelation that "shocked" the teacher, who was unaware of any problems.

### Procedural History

L.W.'s mother filed a complaint with the Division on Civil Rights on her and her son's behalf, claiming that L.W. was repeatedly subjected to harassment by his peers due to his perceived sexual orientation.[1] The complaint alleged that the District's failure to take corrective action violated the LAD. The matter was referred to the Office of Administrative Law and a three-day hearing was held. The Administrative Law Judge (ALJ) concluded that a cause of action against a school district for student-on-student sexual harassment was not cognizable under the LAD. Further, even assuming that the LAD recognized such a cause of action, the ALJ opined that L.W.'s claim should be governed by Title IX standards. Title IX, which prohibits sexual discrimination in any federally-funded educational program, permits liability "only where the funding recipient acts with deliberate indifference to known acts of harassment." *Davis v. Monroe County Bd. of Educ.*, 526 *U.S.* 629, 633, 119 *S.Ct.* 1661, 1666, 143 *L.Ed.*2d 839, 847 (1999). The ALJ thus rejected the standards governing hostile work environment sexual harassment under the LAD, which hold an employer liable when "the employer had actual knowledge of the harassment and did not promptly and effectively act to stop it." *Lehmann v. Toys 'R' Us, Inc.*, 132 *N.J.* 587, 622, 626 *A.*2d 445 (1993).

The Director of the Division on Civil Rights reviewed and rejected the ALJ's dismissal of the complaint. The Director found that the LAD recognized hostile environment claims against a school district. The Director adopted "standards similar to those established ... in *Lehmann*" and concluded that a "school district will be liable for such harassment where the school administration or its agents or employees knew or should have known of the harassment and failed to take effective measures to stop it."

---

[1] The LAD enumerates "affectional or sexual orientation" as a protected characteristic. *N.J.S.A.* 10:5–12(f). Because that phrase expressly encompasses both "perceived" and actual sexual orientation, *N.J.S.A.* 10:5–5(hh), L.W.'s sexual orientation is of no consequence to this case.

Applying those principles, he concluded that L.W. was entitled to recovery. The Director ordered equitable measures, requiring the District to revamp its policies and procedures regarding the prevention of peer sexual harassment. He also awarded $50,000 in emotional distress damages to L.W. and $10,000 in emotional distress damages to his mother. Finally, the Director assessed a $10,000 penalty against the District and granted plaintiffs' application for attorneys' fees.

The Appellate Division affirmed in part and reversed in part, remanding the matter for further proceedings in conformity with its opinion. *L.W. v. Toms River Reg'l Schs. Bd. of Educ.*, 381 *N.J.Super.* 465, 474, 886 *A.*2d 1090 (App.Div.2005). The panel found that "a claim against a school district may be brought under the LAD for peer harassment that is based on an individual's 'affectional or sexual orientation' if the harassment rises to the level of a denial of the 'advantages, facilities or privileges' of a public school." *Id.* at 486, 886 *A.*2d 1090. The court held that principles "substantially the same as those employed to determine whether sexual harassment creates a hostile work environment" under *Lehmann* govern student-on-student harassment allegations. *Id.* at 486, 886 *A.*2d 1090. Therefore, the Appellate Division affirmed the $50,000 compensatory damages award to L.W. *Id.* at 499–500, 886 *A.*2d 1090.

However, the panel reversed the Director's award of $10,000 to L.W.'s mother, finding that she was not an aggrieved person under the LAD. *Id.* at 500–01, 886 *A.*2d 1090. Further, the Appellate Division reversed the Director's order requiring the adoption of remedial measures and remanded the matter for reconsideration consistent with its opinion. *Id.* at 497–98, 886 *A.*2d 1090. The court concluded that the record did not support such remedies because there was no evidence indicating either a district-wide problem concerning student-on-student harassment based on sexual orientation or any such harassment in the District's schools since L.W.'s attendance. *Ibid.* Judge Alley dissented, disagreeing with the majority's finding that the District failed

to take effective remedial measures. *Id.* at 501, 886 *A.*2d 1090 (Alley, J., dissenting). According to the dissent, the record was bereft of evidence indicating how other school districts handle peer harassment, thus making any determination of reasonableness problematic. *Id.* at 502–04, 886 *A.*2d 1090 (Alley, J., dissenting).

Based on the dissent in the Appellate Division, the District's appeal of the ineffective remedial measures finding is before us as of right. *R.* 2:2–1(a)(2). We also granted the District's petition for certification concerning whether the LAD provides a cause of action for peer harassment, and, if so, what the appropriate standard of liability is for such a claim. 186 *N.J.* 605, 897 *A.*2d 1060 (2006). Seven child advocacy and civil rights organizations, including the American Civil Liberties Union, submitted a joint amicus curiae brief.

## II.

■ "Freedom from discrimination is one of the fundamental principles of our society." *Lehmann, supra,* 132 *N.J.* at 600, 626 *A.*2d 445. With that bedrock principle in mind, "the overarching goal of the [LAD] is nothing less than the eradication 'of the cancer of discrimination.'" *Fuchilla v. Layman,* 109 *N.J.* 319, 334, 537 *A.*2d 652 (quoting *Jackson v. Concord Co.,* 54 *N.J.* 113, 124, 253 *A.*2d 793 (1969)), *cert. denied,* 488 *U.S.* 826, 109 *S.Ct.* 75, 102 *L.Ed.*2d 51 (1988). In short, the LAD is the Legislature's attempt to "protect society from the vestiges of discrimination." *Cedeno v. Montclair State Univ.,* 163 *N.J.* 473, 478, 750 *A.*2d 73 (2000).

■ Enacted in 1945 as the first state anti-discrimination statute in the nation, the LAD ensures "that the civil rights guaranteed by the State Constitution are extended to all its citizens." *Viscik v. Fowler Equip. Co., Inc.,* 173 *N.J.* 1, 12, 800 *A.*2d 826 (2002) (citing *L.* 1945, c. 169; *N.J.S.A.* 10:5–2). The Legislature declared that "discrimination threatens not only the rights and proper privileges of the inhabitants of the State but menaces the

institutions and foundation of a free democratic State ... [and] that because of discrimination, people suffer personal hardships, and the State suffers a grievous harm." *N.J.S.A.* 10:5–3. With those legislative underpinnings as a backdrop, this Court has liberally construed the LAD to further the Legislature's broad remedial objectives. *See Viscik, supra,* 173 *N.J.* at 13, 800 *A.*2d 826; *see also N.J.S.A.* 10:5–3 ("[T]his act shall be liberally construed in combination with other protections available under the laws of this State."). Moreover, our courts counsel that "the more broadly [the LAD] is applied the greater its antidiscriminatory impact." *Ptaszynski v. Uwaneme,* 371 *N.J.Super.* 333, 345, 853 *A.*2d 288 (App.Div.), *certif. denied,* 182 *N.J.* 147, 862 *A.*2d 56 (2004).

## III.

■ The first question presented in this appeal is whether the LAD recognizes a cause of action against a school district for student-on-student harassment based on perceived sexual orientation. Because that question entails statutory interpretation, we begin with the statute's plain language—our polestar in discerning the Legislature's intent. *See DiProspero v. Penn,* 183 *N.J.* 477, 492, 874 *A.*2d 1039 (2005) (stating that statutory language is "best indicator" of legislative intent); *Alan J. Cornblatt, P.A. v. Barow,* 153 *N.J.* 218, 231, 708 *A.*2d 401 (1998) (noting that statute's language is "surest indicator" of legislative intent). "If the language is plain and clearly reveals the statute's meaning, the Court's sole function is to enforce the statute according to its terms." *Frugis v. Bracigliano,* 177 *N.J.* 250, 280, 827 *A.*2d 1040 (2003).

The LAD provides, in pertinent part:

All persons shall have the opportunity to ... obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation ... without discrimination because of race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation, familial status, disability, nationality, sex or source of lawful income used for rental or mortgage payments.... This opportunity is recognized as and declared to be a civil right.

[*N.J.S.A.* 10:5–4.]

Pursuant to the LAD, it is unlawful "[f]or any owner, lessee, proprietor, manager, superintendent, agent, or employee of any place of public accommodation directly or indirectly to refuse, withhold from or deny to any person any of the accommodations, advantages, facilities or privileges thereof, or to discriminate against any person in the furnishing thereof" on the basis of that person's "affectional or sexual orientation." *N.J.S.A.* 10:5–12(f). "Affectional or sexual orientation" is defined by the Act as "male or female heterosexuality, homosexuality or bisexuality by inclination, practice, identity or expression, having a history thereof or being perceived, presumed or identified by others as having such an orientation." *N.J.S.A.* 10:5–5(hh). Further, "place of public accommodation" expressly includes "any ... primary and secondary school, ... high school, ... or any educational institution under the supervision of the State Board of Education, or the Commissioner of Education of the State of New Jersey." *N.J.S.A.* 10:5–5(*l* ).

■ Application of the LAD to claims filed against school districts for student-on-student affectional or sexual orientation harassment will address a significant problem facing our State's educational system. In fact, our Legislature has confronted the negative impact of "harassment, intimidation, and bullying" in our schools. *See N.J.S.A.* 18A:37–13 to –18 (enacting procedures to curb acts "reasonably perceived as being motivated either by actual or perceived characteristic, such as ... sexual orientation"). As the Legislature found,

[A] safe and civil environment in school is necessary for students to learn and achieve high academic standards; harassment, intimidation or bullying, like other disruptive or violent behaviors, is conduct that disrupts both a student's ability to learn and a school's ability to educate its students in a safe environment.
[*N.J.S.A.* 18A:37–13.]

Commentators underscore the insidious existence and detrimental effects of peer sexual harassment in our schools. *See, e.g.,* Rebecca A. Oleksy, Comment, *Student–on–Student Sexual Harassment: Preventing a National Problem on a Local Level,* 32 *Seton Hall*

*L.Rev.* 230, 230 (2001) ("Student-on-student sexual harassment is a pervasive problem in primary and secondary schools throughout our nation."). The Legislature underscored the problem's severity when it criminalized "bias intimidation." *N.J.S.A.* 2C:16–1. Although that statute is not implicated in this appeal, one who engages in the purposeful intimidation of another because of the victim's sexual orientation is guilty of, at minimum, a fourth degree offense. *Id.* (also listing race, color, religion, gender, handicap, and ethnicity as protected characteristics).

■ Because of the Act's plain language, its broad remedial goal, and the prevalent nature of peer sexual harassment, we conclude that the LAD permits a cause of action against a school district for student-on-student harassment based on an individual's perceived sexual orientation if the school district's failure to reasonably address that harassment has the effect of denying to that student any of a school's "accommodations, advantages, facilities or privileges." *See N.J.S.A.* 10:5–12(f). A contrary conclusion would be incongruous with the LAD's prohibition of discrimination in other settings, including the workplace, because "[t]he right of a student to achieve an education free from sexual harassment is certainly as important as the rights of an employee in a work setting." *K.P. v. Corsey,* 228 *F.Supp.*2d 547, 550 (D.N.J.2002), *rev'd on other grounds,* 77 *Fed.Appx.* 611 (3d Cir. 2003). By recognizing a cause of action against school districts for failing to reasonably address peer-based, affectional orientation harassment, we further the Legislature's goal of eradicating the invidious discrimination faced by students in our public schools.

■ We do not suggest, however, that isolated schoolyard insults or classroom taunts are actionable. Rather, in the educational context, to state a claim under the LAD, an aggrieved student must allege discriminatory conduct that would not have occurred "but for" the student's protected characteristic, that a reasonable student of the same age, maturity level, and protected characteristic would consider sufficiently severe or pervasive enough to create an intimidating, hostile, or offensive school environment,

and that the school district failed to reasonably address such conduct. *See Lehmann, supra,* 132 *N.J.* at 603–04, 626 *A.*2d 445 (enumerating standard for actionable hostile work environment sexual harassment).

## IV.

We turn now to the circumstances under which a school district's actions—or inactions—in preventing and addressing a hostile school environment entitle an aggrieved student to recovery.

### A.

Because the LAD prohibits discrimination in places of public accommodation as well as the workplace, *see N.J.S.A.* 10:5–4, L.W. argues that the Director and the Appellate Division correctly applied a standard similar to the hostile work environment sexual harassment standard of liability enumerated in *Lehmann, supra,* 132 *N.J.* at 622, 626 *A.*2d 445, to the analogous hostile school environment alleged here. This Court in *Lehmann, supra,* held that an employee states a claim for hostile work environment sexual harassment under the LAD when the victim alleges "severe or pervasive" discriminatory conduct that "create[s] an intimidating, hostile, or offensive working environment." 132 *N.J.* at 592, 626 *A.*2d 445. Moreover, in *Lehmann,* this Court established that under the LAD an employer will be liable for compensatory damages for a hostile work environment in three circumstances: (1) when the employer grants a supervisor authority to control the workplace and the supervisor abuses that authority to create a hostile environment, *id.* at 620, 626 *A.*2d 445; (2) when the employer negligently manages the workplace by failing to enact anti-harassment policies and mechanisms, *id.* at 621–22, 626 *A.*2d 445; or (3) when the employer has actual or constructive knowledge of the harassment and fails to take effective measures to end the discrimination, *id.* at 622–23, 626 *A.*2d 445. It is the last circumstance that is relevant in this appeal. The *Lehmann* Court stated that liability may be appropriate "if the employer had

actual knowledge of the harassment and did not promptly and effectively act to stop it." *Id.* at 622, 626 *A.2d* 445. The Court continued:

> *When an employer knows or should know of the harassment and fails to take effective measures to stop it,* the employer has joined with the harasser in making the working environment hostile. The employer, by failing to take action, sends the harassed employee the message that the harassment is acceptable and that the management supports the harasser. *"Effective" remedial measures are those reasonably calculated to end the harassment.* The "reasonableness of an employer's remedy will depend on its ability to stop harassment by the person who engaged in harassment."
>
> [*Id.* at 623, 626 *A.2d* 445 (quoting *Ellison v. Brady*, 924 *F.*2d 872, 882 (9th Cir.1991)) (internal citations omitted) (emphasis added).]

The District, however, maintains that the applicable standard of liability should mirror the standard applied in Title IX actions— the "deliberate indifference" standard. *Davis, supra,* 526 *U.S.* at 642–43, 119 *S.Ct.* at 1671, 143 *L.Ed.*2d at 853. Title IX of the Education Amendments of 1972 provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 *U.S.C.A.* § 1681(a). In *Davis, supra,* the United States Supreme Court considered whether a private action for damages could be brought against a school board under Title IX in cases of student-on-student sexual harassment. 526 *U.S.* at 632, 119 *S.Ct.* at 1666, 143 *L.Ed.*2d at 847. The Court held that such an action exists "only where the funding recipient acts with *deliberate indifference* to known acts of harassment in its programs or activities . . . that is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Id.* at 633, 119 *S.Ct.* at 1666, 143 *L.Ed.*2d at 847 (emphasis added). In rejecting a mere negligence standard and establishing that high bar to recovery, the Supreme Court noted that the claim at issue was an implied private right of action under a statute enacted pursuant to Congress' authority under the Spending Clause. *Id.* at 639–40, 119 *S.Ct.* at 1669, 143 *L.Ed.*2d at 851. Therefore, because legislation grounded in Congress's spending power is contractual in nature, damages are

available only when the recipient of federal funds had adequate notice of its potential liability. *Id.* at 640, 119 *S.Ct.* at 1670, 143 *L.Ed.*2d at 852.

## B.

Although this Court may look to federal jurisprudence for guidance when interpreting the LAD, we will not hesitate to depart "from federal precedent if a rigid application of its standards is inappropriate under the circumstances." *Lehmann, supra,* 132 *N.J.* at 600–01, 626 *A.*2d 445 (quoting *Grigoletti v. Ortho Pharm. Corp.,* 118 *N.J.* 89, 107, 570 *A.*2d 903 (1990)). We reject the Title IX deliberate indifference standard because we conclude that the *Lehmann* standard should apply in the workplace and in the school setting. We find no need to impose a separate standard because the discrimination is in a school.

Additionally, there are substantial differences in scope between the LAD and Title IX. Title IX is narrower than the LAD on three fronts. First, Title IX prohibits discrimination based on sex only. 20 *U.S.C.A.* § 1681(a). That limitation must be juxtaposed against the expansive list of characteristics protected by the LAD, including "affectional or sexual orientation"—the crux of this appeal. *See N.J.S.A.* 10:5–4. Second, Title IX prohibits only recipients of federal educational funds from discriminating against students based on sex. *See Gebser v. Lago Vista Ind. Sch. Dist.,* 524 *U.S.* 274, 286, 118 *S.Ct.* 1989, 1997, 141 *L.Ed.*2d 277, 289 (1998). Indeed, Title IX was enacted pursuant to Congress' authority under the Spending Clause, thereby implicating contract principles. *Davis, supra,* 526 *U.S.* at 640, 119 *S.Ct.* at 1669, 143 *L.Ed.*2d at 851–52. Conversely, the LAD, as does our State Constitution, enforces the guarantee of civil rights, *see N.J.S.A.* 10:5–2, and applies universally to "places[s] of public accommodation," a defined term that includes schools regardless of their source of funding, *N.J.S.A.* 10:5–5(*l*). Third, although courts have found an implied private right of action under Title IX, *see Cannon v. Univ. of Chicago,* 441 *U.S.* 677, 709, 99 *S.Ct.* 1946, 1964,

60 *L.Ed.*2d 560, 582 (1979), the LAD expressly empowers aggrieved persons to file private causes of action seeking a full range of legal and equitable remedies. *N.J.S.A.* 10:5–13.

The Title IX standard is also more burdensome than the LAD test because, to recover, the aggrieved plaintiff must establish deliberate indifference by the defendant. However, as Judge Yannotti found in his well-reasoned opinion below, as a matter of state law it would be unfair to apply a more onerous burden on aggrieved students than on aggrieved employees. *L.W., supra,* 381 *N.J.Super.* at 488, 886 *A.*2d 1090. Students in the classroom are entitled to no less protection from unlawful discrimination and harassment than their adult counterparts in the workplace. *See K.P., supra,* 228 *F.Supp.*2d at 550.

### C.

We are satisfied that the LAD standard governing hostile work environment sexual harassment, as modified below, comports best with the circumstances presented in this appeal. A contrary conclusion would be at loggerheads with the State's strong policy of protecting students. Educators have "[n]o greater obligation ... than to protect the children in their charge from foreseeable dangers, whether those dangers arise from the careless acts or intentional transgressions of others." *Frugis, supra,* 177 *N.J.* at 268, 827 *A.*2d 1040. Although *Frugis* involved the need to protect children from adults, its rationale applies to the present circumstances. That is, a school district's "first imperative must be to do no harm to the children in its care. A board of education must take reasonable measures to assure that the teachers and administrators who stand as surrogate parents during the day are educating, not endangering, and protecting, not exploiting, vulnerable children." *Ibid.*

A school cannot be expected to shelter students from all instances of peer harassment. Nevertheless, reasonable measures are required to protect our youth, a duty that schools are more than capable of performing. *See Vernonia Sch. Dist. 47J v.*

*Acton,* 515 *U.S.* 646, 655, 115 *S.Ct.* 2386, 2392, 132 *L.Ed.*2d 564, 576 (1995) (noting that state's power over schoolchildren "is custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults"); *Davis v. Monroe County Bd. of Educ.,* 120 *F.*3d 1390, 1417 n. 7 (11th Cir.1997) (Barkett, J., dissenting) ("The ability to control and influence behavior exists to an even greater extent in the classroom than in the workplace."), *rev'd, supra,* 526 *U.S.* 629, 119 *S.Ct.* 1661, 143 *L.Ed.*2d 839.

██ In the school setting, the *Lehmann* standard requires that a school district may be found liable under the LAD for student-on-student sexual orientation harassment that creates a hostile educational environment when the school district knew or should have known of the harassment, but failed to take action reasonably calculated to end the harassment. That standard conforms to the Act's fundamental and laudatory goal of eradicating "the cancer of discrimination," *Lehmann, supra,* 132 *N.J.* at 600, 626 *A.*2d 445, and comports with the liberal construction mandated for this remedial statute, *see Cedeno, supra,* 163 *N.J.* at 478, 750 *A.*2d 73. We thereby further the Legislature's objective of eliminating bias-based harassment from New Jersey schools embodied in the LAD, *N.J.S.A.* 10:5–4 & 10:5–5(*l*), and other statutes, *see, e.g., N.J.S.A.* 18A:37–13 to –19 (establishing anti-bullying measures).

██ Because we do not create a strict liability standard, a district is not compelled to purge its schools of all peer harassment to avoid liability. Rather, we require school districts to implement effective preventive and remedial measures to curb severe or pervasive discriminatory mistreatment. Appropriate and reasonable measures will reinforce the basic principle that student-on-student sexual harassment is unacceptable.

## V.

### A.

Although the above discussion provides a framework for the adjudication of student-on-student harassment disputes that occur

in an educational setting, the application of a modified *Lehmann* standard in the present and future litigation requires further guidance.

In assessing the reasonableness of a school district's response to a hostile educational environment, we are mindful that schools are different from workplaces. The United States Supreme Court recognized as much, stating:

> [S]chools are unlike the adult workplace and ... children may regularly interact in a manner that would be unacceptable among adults. Indeed, at least early on, students are still learning how to interact appropriately with their peers. It is thus understandable that, in the school setting, students often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it.
>
> [*Davis, supra,* 526 *U.S.* at 651–52, 119 *S.Ct.* at 1675, 143 *L.Ed.*2d at 859 (internal citations omitted).]

Factfinders, therefore, must determine the reasonableness of a school district's response to peer harassment in light of the totality of the circumstances, that is, the "constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a single recitation of the words used or the physical acts performed." *Oncale v. Sundowner Offshore Servs. Inc.,* 523 *U.S.* 75, 82, 118 *S.Ct.* 998, 1003, 140 *L.Ed.*2d 201, 208 (1998) (concerning Title VII violation). Indeed, after the events at issue in this appeal, the Department of Education (DOE) established—and regularly updates—a model policy to direct school districts in the establishment and maintenance of policies prohibiting harassment, intimidation, and bullying in the educational arena. *See* N.J. Dept. of Educ., *Model Policy and Guidance for Prohibiting Harassment, Intimidation and Bullying on School Property, at School–Sponsored Functions and on School Buses* (revised 2006) http://www.state.nj.us/njded/parents/bully.htm (last visited Feb. 15, 2007) [hereinafter *Model Policy*]; *see also N.J.S.A.* 18A:37–13 to –18 (requiring school districts to adopt policies prohibiting harassment based on actual or perceived characteristics, including sexual orientation). The DOE

> recognizes that decisions about consequences and actions to be taken in response to violations of policies prohibiting harassment, intimidation and bullying should take

into consideration the unique circumstances of the acts and the persons involved, as well as the unique conditions and characteristics in each school district.

[*Model Policy, supra,* at 1.]

Illustratively, a reasonable response to name-calling among grade-schoolers may be inadequate to address violence among teenagers. The factfinder, therefore, should consider all relevant circumstances, including, but not limited to, the students' ages, developmental and maturity levels; school culture and atmosphere; rareness or frequency of the conduct; duration of harassment; extent and severity of the conduct; whether violence was involved; history of harassment within the school district, the school, and among individual participants; effectiveness of the school district's response; whether the school district considered alternative responses; and swiftness of the school district's reaction. Only a fact-sensitive, case-by-case analysis will suffice to determine whether a school district's conduct was reasonable in its efforts to end the harassment. Furthermore, in analyzing school district responses, where applicable, the triers of fact should consult DOE regulations, model policies, and other guidance that the agency provides. *See, e.g., N.J.A.C.* 6A:7–1.4(a) & 6A:16–7.9(a)2; *Model Policy, supra.*

With those and other considerations in mind, factfinders must consider the cumulative effect of all student harassment and all efforts of the school district to curtail the maltreatment. Agencies and courts reviewing the adequacy of a school district's response must avoid a cabined perspective that views incidents of harassment and responses to offensive conduct in isolation. Courts must "bear[ ] in mind that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the . . . environment created may exceed the sum of the individual episodes." *Lehmann, supra,* 132 *N.J.* at 607, 626 *A.*2d 445 (quotation omitted).

Finally, as conceded at oral argument, expert evidence may be required to establish the reasonableness of a school district's response to student-on-student harassment. Common

sense will often signal the unreasonableness of inaction by a school district faced with systemic and persistent peer harassment. However, in the more typical dispute, the reasonableness of a school's response may not be apparent. In those more contentious circumstances, factfinders may be assisted by expert opinion regarding educational theories and principles, as well as the standards, policies, and procedures employed in the profession by similarly situated educators.

### B.

Having established the standard by which a school district may be held liable under the LAD for student-on-student harassment and having provided guidance to future factfinders, we conclude that a remand is required in the present dispute. Specifically, we remand to the Director of the Division on Civil Rights with the further direction that this matter be referred to the Office of Administrative Law to permit supplementation of the record, if requested by either party. This, we require, as a matter of fairness to the parties.

The present record was developed before the parties were aware of the standard that we now adopt for use in assessing a school district's response to student-on-student harassment. As discussed, that standard requires that a district's response to peer harassment be measured under a standard of reasonableness in the educational context. The parties in this matter, therefore, must be permitted the opportunity to be heard on that standard. Due process considerations also require that the parties be permitted, on application, to supplement the record with evidence of what a reasonable response would have been at the time of the circumstances occurring in respect of L.W. in 1998 to 2000 when he was in the seventh and eighth grades, and even earlier as this record relates events that began when L.W. was in elementary school.

In that respect, we note that the District, in attempting to respond to the harassment of L.W., was acting at a time when it

lacked the benefit of the DOE's guidance on how to deal comprehensively with student-on-student harassment and intimidation. As previously noted, in 2002 the Legislature enacted anti-bullying legislation directing the DOE to provide leadership to public school districts on how to discharge their responsibility to curtail inappropriate and hurtful peer-based harassment on school property, at school-sponsored functions, or on school transportation vehicles. *See N.J.S.A.* 18A:37–13 to –17 (addressing in 2002 harassment, intimidation, and bullying in public schools, and requiring districts to establish policies prohibiting same and to provide preventative programs for students, staff, and school volunteers). The DOE has since established a model policy providing examples of remedial and preventative measures that school districts may employ to curtail harassment. *See Model Policy, supra.* Furthermore, in 2003, the DOE promulgated *N.J.A.C.* 6A:7–1.4(a), requiring school districts to implement written policies that "recognize and value" diversity and promote the acceptance of those with varying backgrounds, including those of different "affectional or sexual orientation."

Although the DOE's regulatory actions occurred after the events at issue herein, any assessment of the reasonableness of the District's actual response may be informed by what the DOE currently advises school districts to do in such circumstances. Moreover, as noted above, the parties should have the opportunity to present the opinions of experts concerning what educators during the relevant timeframe considered a reasonable response to be.

## VI.

Summarizing, we hold that a cause of action against a school district alleging student-on-student affectional or sexual orientation harassment that is not reasonably addressed by the school district is cognizable under the LAD. When assessing a school district's liability, the factfinder must determine whether

the district, with actual or constructive knowledge of the maltreatment, took actions reasonably calculated to end the harassment.

Our approach accommodates the competing interests present in this appeal. When a student is subjected to severe or pervasive bullying on the school bus, in the classroom, or at the playground, and a school district fails to adequately respond to that misconduct, that student has a right to redress. However, school districts will be shielded from liability when their preventive and remedial actions are reasonable in light of the totality of the circumstances.

We affirm as modified and remand this matter to the Director of the Division on Civil Rights, with the direction that the case be referred to the Office of Administrative Law for proceedings consistent with this opinion.

*For affirmance as modified/remandment*—Chief Justice ZAZZALI and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—7.

*Opposed*—None.