**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2123-23

S.G.,[1]

      Appellant,

v.

NEW JERSEY DEPARTMENT
OF CORRECTIONS,

      Respondent.

_____

| |
|---|
| **APPROVED FOR PUBLICATION** |
| **March 4, 2026** |
| **APPELLATE DIVISION** |

      Argued January 21, 2026 – Decided March 4, 2026

      Before Judges Sumners,[2] Susswein, and Chase.

      On appeal from the New Jersey Department of Corrections.

      Ruth O'Herron argued the cause for appellant (Gibbons PC and Jennifer N. Sellitti, Public Defender, attorneys; Michael R. Noveck, of counsel and on the briefs).

      Justine Longa, Deputy Attorney General, argued the cause for respondent (Jennifer Davenport, Acting

---

[1] Records relating to civil commitment proceedings are confidential, thus we refer to S.G. by initials to comply with our Court Rules. R. 1:38-3(f)(2).

[2] Judge Sumners was added to the panel after oral argument with the consent of all counsel.

Attorney General, attorney; Janet Greenberg Cohen, Assistant Attorney General, of counsel; Andrew D. Spevak, Deputy Attorney General, on the brief).

The opinion of the court was delivered by

CHASE, J.A.D.

Resident, S.G., who identifies as female, is civilly committed to the Special Treatment Unit ("STU") under the Sexually Violent Predator Act ("SVPA"), N.J.S.A. 30:4-27.24 to -27.38.[3] She appeals from the Department of Correction's ("DOC") January 4, 2024 final agency decision denying her request to transfer from the STU to a women's-only correctional facility.

S.G. alleges discrimination, invoking both the Law Against Discrimination ("LAD"), N.J.S.A. 10:5-1 to 14.1, and the Equal Protection Clause. She asserts gender-based indignities, claims to have suffered harassment, and argues the DOC failed in its duty to protect her dignity and identity.

Careful review of the record, in light of the legislative intent and established principles, yields the following: The DOC is bound by law to house sexually violent predators separately from inmates serving criminal sentences and designates the STU as the sole treatment facility for all

---

[3] Individuals who are committed to the STU are referred to as residents.

adjudicated SVPs. This classification is not arbitrary, capricious, or unreasonable. It serves the statutory purpose—protection of society and provision of treatment.

The LAD prohibits exclusion and indignity yet does not compel sex-segregated facilities for civilly committed persons. The Equal Protection Clause is not offended where legitimate, nondiscriminatory reasons govern placement. The record shows S.G. is not denied equal dignity, nor uniquely burdened on account of her gender identity. Thus, we affirm the DOC final agency decision.

I.

In December 2010, S.G. sexually assaulted a four-year-old girl. In 2011, S.G. pled guilty to aggravated sexual assault of a minor and was sentenced to ten years' imprisonment, Megan's Law registration, and parole supervision for life. After serving her sentence at the Adult Diagnostic and Treatment Center ("ADTC"), the court civilly committed her to the STU in 2019.

Since S.G. has been a resident at the STU, she has consistently identified as a woman, expressed a desire to transition, and presented accordingly.

Medical professionals diagnosed her with gender dysphoria[4] and prescribed hormone therapy, in addition to off-site treatment.

The SVPA requires the DOC to operate a "secure facility" in which persons who are civilly committed under the Act "shall be housed and managed separately . . . and segregated" from "offenders" who are incarcerated. N.J.S.A. 30:4-27.34(a). The SVPA assigns to the Department of Health ("DOH"), the primary responsibility for the treatment of SVP's while the DOC operates the STU. See N.J.A.C. 10A:35-1.1; 50 N.J.R. 1517(a).

At the STU, residents can be placed in either of two housing areas known as "Main" and "Annex." The core difference between the two is that "Main" residents are assigned individual rooms, while in the "Annex" they are housed for the most part in a dormitory setting (excluding certain residents with medical needs).

Upon her arrival at the STU, S.G. was placed into the Main North Unit. On Main North, S.G. has her own room, with access to single occupancy showers, all the programming available to STU residents, as well as the ability to purchase any personal items, including any healthcare items. Like most

---

[4] See Sacklow v. Betts, 450 N.J. Super. 425, 431 n.3 (Ch. Div. 2017) ("According to the American Psychiatric Association, gender dysphoria 'involves a conflict between a person's physical or assigned gender and the gender with which he/she/they identify.'").

other residents on Main, she can freely move between and access the common spaces and treatment rooms within Main.

In July 2023, S.G. indicated to her treatment provider that her attorney was going to apply for her transfer to the female-only Edna Mahan Correctional Facility. During this time, the DOC and DOH had drafted, but not finalized, a Joint Transgender Policy to "create inter agency policy, procedure, and guidance to provide best practices for mental health, medical needs, and care and custody for STU Residents who identify as transgender."[5]

Upon learning of S.G.'s pending transfer request, the STU Clinical Director, Doreen Stanzione, Ed.D., scheduled a meeting with S.G. and a DOH treatment team to provide a housing recommendation to DOC in the spirit of honoring the draft Transgender Housing Policy. Multiple meetings with S.G. occurred over the next couple of weeks. In those meetings, S.G. claimed to have been subject to gender-based discrimination and mistreatment by staff and other residents.

At the conclusion of those meetings, Dr. Stanzione drafted a DOH Transgender Housing Committee Statement which stated that S.G. identified four reasons underlying her transfer request: (1) a resident previously "pushing up" on her for sexual favors; (2) inappropriate comments from

---

[5] At oral argument, we were informed that the policy is still in draft form.

residents; (3) stolen and damaged undergarments from the laundry department; and (4) anticipated increasing risk with her anticipated gender-affirming surgery.

The statement also detailed that S.G. and treatment staff agreed that while there was an absence of "off-site" options for STU residents, her current housing arrangement was appropriate. It also stated that the assessment team found that they believed that her risk of recidivating would not be negatively impacted by an off-site placement. The treatment and assessment teams recommended that she remain in her current housing with the caveat that "off-site" or separate housing should be made available as S.G. continued to develop secondary feminine sex characteristics.

Additionally, Dr. Stanzione indicated that the DOH and DOC had begun working on installing cameras in the laundry area and addressed the appropriate standards for laundry work with the current laundry worker. Dr. Stanzione also documented that she had relayed S.G.'s concerns regarding other resident's inappropriate behavior to the DOC Special Investigations Division ("SID").

In November, S.G. submitted a Gender Identity Information Form to the DOC to officially designate her gender identity as female for the first time. She then filed a grievance citing DOC Policy PCS.001. TGI.01, which applies

A-2123-23

to transgender, intersex, and non-binary incarcerated persons in custody at correctional facilities. S.G. alleged that she was being subjected to "discriminatory treatment and harassment from other residents," including one instance of physical assault, and denial of gender affirming care. She requested that the DOC "identify a female-only residence" where she may be transferred and allow her to "submit a formal request for transfer to this female-only site." S.G.'s counsel then sent a letter to DOC alleging that a STU staff member had harassed S.G. by watching her, on one occasion, while she was in her undergarments, get dressed.

Upon receipt of the grievance, ADTC Administrator Patricia Nah notified the SID of a potential violation of the Prison Rape Elimination Act ("PREA"), 34 U.S.C. §§ 30301 to 30309, and the SID team continued to investigate the allegations. Nah also informed S.G.'s doctors of her complaints. After not hearing back from Nah, and assuming this silence meant the request had been denied, S.G. filed an internal appeal of the grievance's closure.

SID investigated S.G.'s claims. SID took a taped statement from S.G., but she could not provide specific dates or times of her allegations, other than that these incidents occur daily. SID investigators conducted interviews with eight other residents to further investigate S.G.'s claims. For the few incidents

A-2123-23

that S.G. provided the names of residents, each alleged assailant denied the allegation of harassment. SID also reviewed videotapes but could find no evidence of harassment.

On January 4, 2024, the DOC closed S.G.'s appeal and informed S.G.:

> Please be advised that the policy referenced (PCS.001. TGI.01.) is applicable to incarcerated persons, not residents. As you know, there are a number of differences between the two populations, so that would make it impractical to have the same policy for both. Additionally, the DOC does not maintain a separate facility for female STU residents at this time. In any event, we are working internally to appropriately address your needs. Moreover, you were interviewed for safety concerns on 12/4/2023. At which time, you stated that you were assaulted . . . a few months ago, but the issue was already addressed and that you have not been assaulted since. Lastly, feel free to advise of any future issues via JPAY. Thank You[.]

This appeal followed.

During the pendency of this appeal, the DOC requested a remand so that the record could be supplemented to adequately reflect the Department's full decision-making process. We granted a temporary remand. Following the remand, the DOC provided S.G. with three additional documents: the draft "Transgender Policy" for the STU; the October 3, 2023 "DOH Transgender Housing Committee Statement" from Dr. Stanzione; and a supplemental letter from Patricia Nah, dated January 9, 2025.

Nah's supplemental letter stated that "DOC has determined that [S.G.] cannot be placed into alternative housing outside the STU at this time." Nah explained that the DOH staff discussed options and ultimately found that her current placement—a room with her own sleeping arrangements and bathroom—remained the best option for her, as off-site housing would increase her risk of sexual recidivism. The DOC also reasoned that it "does not have a separate facility or housing unit for transgender residents." The letter also stated, "[p]lacement outside the STU jeopardizes [S.G.'s] treatment and poses management and security issues with regard to her safety . . . and the safety of the public."

## II.

"[A] 'strong presumption of reasonableness attaches to the actions of the administrative agencies.'" In re Carroll, 339 N.J. Super. 429, 437 (App. Div. 2001) (quoting In re Vey, 272 N.J. Super. 199, 205 (App. Div. 1993)). "[D]ecisions made by an administrative agency entrusted to apply and enforce a statutory scheme" are reviewed "under an enhanced deferential standard." East Bay Drywall, LLC v. Dep't of Lab. & Workforce Dev., 251 N.J. 477, 493 (2022).

Therefore, our role in reviewing a final decision of the DOC is limited. Figueroa v. N.J. Dep't of Corr., 414 N.J. Super. 186, 190 (App. Div. 2010).

A-2123-23

Indeed, "[w]ide discretion is afforded to administrative decisions because of an agency's specialized knowledge." Matter of Request to Modify Prison Sentences, 242 N.J. 357, 390 (2020). The decision will not be disturbed on appeal unless it was "arbitrary, capricious, or unreasonable or it [was] not supported by substantial credible evidence in the record as a whole." Mejia v. N.J. Dep't of Corr., 446 N.J. Super. 369, 376 (App. Div. 2016) (quoting Henry v. Rahway State Prison, 81 N.J. 571, 579-80 (1980)).

"Basic to the resolution of any proceeding seeking review of prison administrative action is the legal principle that courts will not interfere with the internal administration of the institution, absent action by the prison authorities which deprives an inmate of [their] constitutional rights or is clearly capricious or arbitrary." State v. Rydzewski, 112 N.J. Super. 517, 521 (App. Div. 1970). Thus, the arbitrary and capricious standard focuses on four questions:

> (1) whether the agency's decision offends the State or Federal Constitution; (2) whether the agency's action violates express or implied legislative policies; (3) whether the record contains substantial evidence to support the findings on which the agency based its action; and (4) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.

A-2123-23

[Karins v. City of Atl. City, 152 N.J. 532, 540 (1998) (quoting George Harms Constr. Co. v. New Jersey Turnpike Auth., 137 N.J. 8, 27 (1994)).]

III.

We begin with S.G.'s contention that the DOC's decision is arbitrary, capricious, or unreasonable because it violates "express . . . legislative policies" enshrined in the LAD. S.G. further asserts that because of this violation, her allegations amounted to a prima facie case of unlawful discrimination on the basis of her sex, gender identity, and/or gender expression. We are not persuaded.

The LAD protects against discrimination in the workplace, housing, and places of public accommodation.[6] N.J.S.A. 10:5-4. It prohibits discrimination based on sex, gender identity, and gender expression, and demands that managers of places of public accommodation, which are "in [their] nature reasonably restricted exclusively to individuals of one sex[,]" must nonetheless admit "individuals . . . based on their gender identity or expression." N.J.S.A. 10:5-12(f)(1).

When analyzing LAD claims, we follow the "'procedural burden-shifting methodology' set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792,

---

[6] For the purposes of this appeal, the DOC did not challenge that the STU is a place of public accommodation.

802-04 (1973)."  Meade v. Tp. of Livingston, 249 N.J. 310, 328 (2021) (quoting Zive Stanley Roberts, Inc., 182 N.J. 436, 447 (2005)) (internal citation reformatted).  Under this burden-shifting framework:

> (1) the plaintiff must come forward with sufficient evidence to constitute a prima facie case of discrimination; (2) the defendant must then show a legitimate nondiscriminatory reason for its decision; and (3) the plaintiff must then be given the opportunity to show that defendant's stated reason was merely a pretext or discriminatory in its application.
>
> [Ibid. (quoting Henry v. Dep't of Hum. Servs., 204 N.J. 320, 331 (2010)).]

First, S.G. fails to state a prima facie claim under the LAD.  S.G. mistakenly believes that N.J.S.A. 10:5-12(f)(1) requires facilities to be sex-segregated and that people's assignments in these sex-segregated facilities will be aligned with their gender expression or identity.  But that is not what the LAD says.  N.J.S.A. 10:5-12(f)(1) clarifies that the LAD does not bar—but also does not compel—the creation of "any place of public accommodation which is in its nature reasonably restricted exclusively to individuals of one sex."  Moreover, even the caselaw that S.G. cites in an attempt to show that public facilities must be sex-segregated itself is permissive, stating that "facilities or activities which may to a significant degree involve at times an occasion for breach of bodily privacy may reasonably be confined to one

sex[.]"  National Organization for Women v. Little League Baseball, Inc., 127 N.J. Super. 522, 532 (App. Div. 1974) (emphasis added).

The SVPA requires the DOC to operate a facility for those civilly committed under the Act.  Those SVP residents "must be housed and managed separately . . . and segregated" from prisoners.  N.J.S.A. 30:4-27.34(a).  The STU is the only treatment facility currently designated for housing persons adjudicated as SVPs.  Because DOC has designated a single facility to hold all persons adjudicated as SVPs, regardless of their sex assigned at birth or gender identity, the obligations that fall upon sex-restricted facilities under N.J.S.A. 10:5-12(f)(1) are not applicable.

IV.

S.G. also argues that the DOC created a hostile environment through the discriminatory actions of DOC employees and the ongoing harassment of other STU residents that the DOC has failed to address.  Thus, we must determine when the DOC was made aware of the harassment, and whether they took adequate action to end the harassment.  L.W. ex rel. L.G. v. Toms River Regional Schools Bd. of Educ., 189 N.J. 381, 407 (2007).  We conclude that they did.

Days after hearing S.G.'s complaints, the DOC began an investigation of each of S.G.'s claims.  This included interviewing S.G. and eight other

residents as well as trying to obtain video evidence. The DOC was limited in investigating these claims because S.G. could not provide specific dates and times for each incident; stating that the physical assault happened "several months ago." S.G. also had trouble identifying the specific harassing residents and stated that the comments were made when she was "by herself" and that "the comments were not loud enough for the officers or other residents to hear."

Although SIDs attempted to investigate these incidents by reviewing the surveillance videos that existed during the time range that S.G. provided them, they did not find any evidence affirming her claims. The few residents who she named denied the alleged incidents. When some residents identified others as who they believed made harassing comments, DOC interviewed the identified residents, and each of these residents denied doing so. Meanwhile, when S.G. was asked about her safety by investigators, she stated that she "was not specifically threatened by any resident inside the STU" and that "her only concern was that she is a transgender[] woman housed in an institution amongst sexually violent persons."

The incident with the unnamed DOC staff member watching her change also cannot be considered to have created a prima facie LAD claim because she was not being treated differently than other residents in STU. S.G.'s claim

14

that there was an inadequate response to this claim is meritless because she failed to name the DOC staff member, failed to give a date or time of the incident's occurrence, and failed to formally report the incident to the DOC; thereby giving the DOC almost no conceivable way to investigate the claim. Furthermore, although STU residents have rights, these rights, including the right to privacy and the right to dignity, can be denied if deemed "necessary to protect the resident, other residents, staff, general public, or property, or to ensure the safe, secure, and orderly operation of the facility, or for other good cause." N.J.A.C. 8:131-2.3(a).

Second, even if S.G. did state a prima facie claim, the DOC has legitimate, nondiscriminatory reasons for its decision, which S.G. has failed to disprove. A reason is considered legitimate and nondiscriminatory if the defendant can show that they "would have made the same decision even in the absence of the impermissible consideration." Bergen Commer. Bank v. Sisler, 157 N.J. 188, 209 (1999). DOC's legitimate reasons included: currently the STU is not a male-only facility and there is no female-only facility; that SVPs are legally required to be housed separately from incarcerated people; and individualized concerns regarding S.G.'s treatment.

Third, S.G. cannot show that DOC's reason for the decision was merely a pretext or discriminatory in its application. Zive, 182 N.J. at 449. In enacting

15

the SVPA, the Legislature intended "to broaden the reach of New Jersey law to afford protection to society from those sexually violent predators who pose a danger as a result of a mental abnormality or personality disorder which makes them likely to engage in repeated acts of predatory sexual violence." State v. Mumin, 361 N.J. Super. 370, 381 (App. Div. 2003) (quoting In re Civil Commitment of E.D., 353 N.J. Super. 450, 456 (App. Div. 2002)). The aim is also to "provide treatment to sexually violent predators." Id. at 385. Therefore, the law has set out the treatment of SVPs to be distinctly different from those of other incarcerated persons and legally mandates that their treatment and housing is not the same.

The SPVA makes abundantly clear that STU residents are not inmates, and DOC is required to house these two populations separately. This difference is pointedly shown through the way STU treats its residents by addressing "the level of risk and specific criminogenic needs for each Resident while attending to factors that might prove to be barriers to learning and amenability." Therefore, DOC's reasoning is nondiscriminatory and not pretextual; rather, it has been determined to be the best way for S.G. to receive the treatment she needs and is the only legal option.

Notably, S.G. is not precluded from requesting future transfers based on new circumstances if she feels her current placement at the STU is not

16

A-2123-23

suitable. In fact, the DOC agreed to continue to periodically review her housing, consistent with its obligations.

V.

We next analyze S.G.'s contention that the DOC violated her equal protection rights. S.G. argues by providing transgender people incarcerated in prisons a procedure whereby they may seek transfer to a secure facility that reflects their gender identity and expression, while denying access to the same or a similar procedure to her because she is a STU resident, the DOC subjected her to unfair differential treatment on the basis of her civil commitment status.[7] We are not convinced.

The New Jersey Constitution guarantees equal protection of the laws under Article I, Paragraph 1. Lewis v. Harris, 188 N.J. 415, 442 (2006). The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." State v. Chun, 194 N.J. 54, 100 (2008) (quoting City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985)). In New Jersey, a balancing test considers a three-factor analysis to determine if a person's equal protection rights have been violated, weighing "'[1] [the] nature of the affected right, [2] the extent to which the governmental

_____

[7] At oral argument it was conveyed to us that there are currently four other transgender women at the STU.

restriction intrudes upon it, and [3] the public need for the restriction.'" Caviglia v. Royal Tours of Am., 178 N.J. 460, 473 (2004) (quoting Greenberg v. Kimmelman, 99 N.J. 552, 567 (1985)).

DOC was not treating S.G. differently due to her gender identity or expression; rather, she was being treated differently because the law requires SVPs to be housed separately from incarcerated persons and this placement was best for her treatment as an SVP. The DOC relied on numerous valid factors in denying S.G.'s claim that are unrelated to her status as a transgender woman—such as safety concerns, S.G.'s need for treatment, her need to learn how to navigate and avoid situations that may trigger a relapse, loneliness, and her need to learn how to integrate into society on a practical level. The decision was an individualized determination of S.G.'s needs, including the management and safety concerns by her STU placement. Because the differential treatment between SVPs and incarcerated persons serves New Jersey's legitimate and important interests, we find her Equal Protection argument to be without merit.

Although incarcerated persons who are transgender may be able to transfer to female-only facilities, this is not differential treatment, as not only do STU residents receive specific treatment for their respective conditions, but they also can receive support from DOC staff to aid in their medical transition.

Therefore, rejecting S.G.'s transfer is not an intrusion on her right to be free from discrimination based on her status as an SVP.

In weighing the Greenberg factors, we recognize the right for transgender individuals to be free from discrimination based on their gender identity is highly valued as shown through the fact that it is explicitly included as a protected class under N.J.S.A. 10:5-12. 99 N.J. at 567. However, the rejection of her transfer request does not significantly intrude on her rights. The DOC staff actively affirms S.G.'s gender identity, she participates in twice weekly process groups where her gender identity is clinically addressed, she has a supportive group of transgender peers, and DOC staff escort her to medical transition appointments and ensure that she has proper treatment for her transition.

"The public need for the restriction" also weighs in DOC's favor. Caviglia, 178 N.J. at 473. The goals of STU, in contrast to that of typical incarceration, are not punitive and aim "to protect other members of society from the danger posed by sexually violent predators." In re Commitment of J.M.B., 197 N.J. 563, 571 (2009) (citing N.J.S.A. 30:4-27.25); In re Civil Commitment of W.X.C., 204 N.J. 179, 201 (2010). Thus, STU does not intend to punish, but rather to provide "[a] secure environment for involuntarily

civilly committed sexually violent predators which encourages participation in sex offender treatment." N.J.A.C. 10A:35-1.2(a)(2).

When weighing the factors it is important to differentiate that while inmates and STU residents both are in involuntary detention, they are not similarly situated. Of most significance, inmates are subject to a finite term of imprisonment based on the imposition of a set period of incarceration at the discretion of a judge. The goals of incarceration include punishing past behavior and trying to prevent future crimes through rehabilitation and the deterrence prospect of future incarceration. N.J.A.C. 10A:1-1.1(a) (1-7). In sharp contrast, civil commitment is permitted, not to punish past behavior, but instead because of a determination that the person in question qualifies as an SVP—defined as someone who "suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for control, care and treatment." N.J.S.A. 30:4-27.26. Therefore, given the unique interests protected by the SVPA and the Legislature's undeniably significant interest in effectively treating SVPs for their own safety and for the safety of the public, the factors balance in favor of the DOC.

Lastly, we briefly address S.G.'s contention that the DOC violated her rights by housing her in a men's facility while two cisgender women who were

civilly committed pursuant to the SVPA were housed in a women's prison. In support of this argument, S.G. submits certifications, in her reply brief, from two attorneys who represented civilly committed cisgender women who were allegedly housed at Edna Mahan Correctional Facility. This argument is unavailing for several reasons. First, it is well settled that a party may not raise new or expanded arguments in a reply brief. See State v. Smith, 55 N.J. 476, 488 (1970); Borough of Berlin v. Remington & Vernick Eng'rs, 337 N.J. Super. 590, 596 (App. Div. 2001). Moreover, addressing this issue at this stage would require us to speculate as to the circumstances under which a non-incarcerated person might be placed in a facility with individuals serving criminal sentences, potentially in violation of the law. Accordingly, we decline to consider this claim in the absence of a complete record. Second, the STU is not designated as a male-only facility; rather, it houses SVPs of any gender identity, including male, female, transgender, or otherwise.

To the extent we have not addressed any of appellant's arguments, we are satisfied they lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(D) and (E).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Hanley

Clerk of the Appellate Division

A-2123-23